**Choon Young CHUNG, Appellee,**

v.

**NANA DEVELOPMENT CORPORATION, Appellant.**

No. 84–2273.

United States Court of Appeals, Fourth Circuit.

Argued June 6, 1985.

Decided Feb. 19, 1986.

Richard Anthony Baenen (Patricia A. Gotschalk, Wilkinson, Barker, Knauer & Quinn, on brief), Washington, D.C., for appellant.

Myron Solter, Washington, D.C., for appellee.

Before SPROUSE, ERVIN and WILKINSON, Circuit Judges.

WILKINSON, Circuit Judge:

The issue on appeal is whether an Alaska corporation, defendant NANA Develop-

ment Corp., is subject to the personal jurisdiction of a federal district court sitting in diversity in Virginia, based upon a single sale in Alaska of reindeer antlers to plaintiff Choon Young Chung, where part of the purchase was subsequently shipped by common carrier to plaintiff in Virginia. The district court found personal jurisdiction to exist under the Virginia long-arm statute, Va.Code § 8.01–328.1(A)(2) (1984). We hold that the "minimum contacts" between NANA and Virginia required by *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) are lacking. Therefore, exercise of jurisdiction over defendant in Virginia is barred by Fourteenth Amendment due process.

## I

NANA Development Corp. is an Alaska corporation, with its principal place of business in Anchorage. It is engaged in selling frozen reindeer antlers, which after processing are sent to the Orient for medicinal purposes.[1] NANA has never solicited any business in Virginia.

Chung, a Virginia resident, initiated dealings with NANA in May 1982, telephoning NANA's Alaska offices to inquire about the possibility of purchasing reindeer antlers. After several conversations between Chung, NANA officials in Alaska, and NANA's joint venturer in San Francisco, John Wang, Chung was told by John Schaeffer of NANA that he could buy 500 pounds of antlers at $35.00 per pound after the June roundup, but would have to take delivery in Nome, Alaska. Chung agreed to these terms.

On June 9, 1982 Chung travelled to Alaska, where he met with NANA officials and watched the reindeer roundup. While in Alaska, Chung purchased 500 pounds of

---

1. NANA operates a range of two million acres in Alaska, with a herd of some 5,000 reindeer. The reindeer are rounded up annually, using helicopters, and their horns clipped. By the next year the antlers regrow. After clipping the horn is frozen, as it contains blood and is perishable, spoiling quickly if thawed.

The antlers, following processing, are sold in various Asian countries, where they are used as a tonic for "promoting strengths of body in particularly weak people," according to plaintiff. Evidently reindeer antler is believed to have aphrodisiac properties.

reindeer antlers on June 14. The total price was $17,500, at the spot market price of $35.00 per pound, and the transaction was evidenced in writing by a NANA invoice. Payment was made at the time of sale by a cashier's check for $12,000 and a personal check for $5,500.

The parties originally contemplated that the entire order of 500 pounds of antlers would be delivered to Chung at the Nome airport. When Chung was ready to depart on June 14, however, only 120 pounds of antlers were ready for him at the airport. Chung could not wait for the delayed 380 pounds to be delivered to him personally in Nome, as his flight was leaving shortly, and Schaeffer thereupon agreed to ship the remainder of the antlers by air to Chung in Virginia within 24 hours. Chung left Alaska with the available 120 pounds of antlers. On June 15, NANA consigned to an air carrier three boxes of "frozen reindeer horns," weighing 378 pounds, freight charges collect to Chung in Washington, D.C. The boxes and airbill were marked with the instruction "keep frozen." No insurance was obtained or value declared on the shipment of antlers.

Chung received notice on June 18 that the shipment had arrived at National Airport in Arlington, Virginia. He promptly went to the airport, where he discovered that the boxes were leaking blood and emitting a "terrible" odor. The antlers had thawed in transit, becoming spoiled and unusable. Chung complained to the carrier, and promptly notified NANA of the loss. Because the shipment was uninsured and had no declared value, however, the carrier offered only the minimum reimbursement of $.50 per pound, or $190. Chung stopped payment on his $5,500 personal check to NANA, and brought this suit to recover the balance of his loss.

The district court, finding personal jurisdiction over NANA in Virginia, determined after a bench trial that NANA had breached its duty to insure the shipment of antlers. Damages were awarded to Chung of $8,207. NANA appeals solely on the question of personal jurisdiction.

## II

■ The connection here presented between NANA and Virginia was not sufficiently substantial to permit the exercise of personal jurisdiction, consistent with the "traditional conception of fair play and substantial justice" embodied in due process. *International Shoe*, 326 U.S. at 320, 66 S.Ct. at 160. Rather, we view this contact as no more than the "isolated" or "attenuated" single transaction which has always been deemed inadequate to satisfy due process. *See Burger King Corp. v. Rudzewicz*, ── U.S. ──, 105 S.Ct. 2174, 2184 n. 18, 85 L.Ed.2d 528 (1985); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 299, 100 S.Ct. 559, 567, 568, 62 L.Ed.2d 490 (1980); *International Shoe*, 326 U.S. at 318, 66 S.Ct at 159. The expansion of interstate commerce, while inducing acceptance of flexible due process standards, has hardly dictated the abandonment of all limits on personal jurisdiction. *World-Wide Volkswagen*, 444 U.S. at 294, 100 S.Ct. at 565. *Hanson v. Denckla*, 357 U.S. 235, 250–51, 78 S.Ct. 1228, 1237–38, 2 L.Ed.2d 1283 (1958). Certain Supreme Court decisions have suggested that these jurisdictional restrictions are based upon federalism, *see e.g. World-Wide Volkswagen*, 444 U.S. at 294, 100 S.Ct. at 565, but more recent opinions establish that due process is concerned with a fundamental individual liberty interest. *Burger King*, 105 S.Ct. at 2181–82 & n. 13; *Insurance Corp. v. Compagnie des Bauxites*, 456 U.S. 694, 702–03 & n. 10, 102 S.Ct. 2099, 2104–05 & n. 10, 72 L.Ed.2d 492 (1982). A defendant is protected by due process against being bound *in personam* by judgments of a forum with which he lacks meaningful relations. *Burger King*, 105 S.Ct. at 2181–82; *International Shoe*, 326 U.S. at 319, 66 S.Ct. at 160. In this case, the only link offered between defendant and the forum state is so unique and unsolicited that to sustain jurisdiction would

inevitably trench upon the personal liberty the Constitution safeguards.[2]

For a defendant to be subject to suit in a forum where it is not physically present, due process demands certain "minimum contacts" with the forum such "as make it reasonable ... to require the corporation to defend the particular suit which is brought there." *International Shoe*, 326 U.S. at 316–17, 66 S.Ct. at 158–59. Ordinarily these contacts should be "continuous and systematic," as opposed to "casual ... single or isolated," *id.* at 317, 66 S.Ct. at 159, a requirement springing from the essential principle "that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson*, 357 U.S. at 253, 78 S.Ct. at 1240.

■■■ The significant contacts considered are those actually generated by the defendant. It is firmly established that "[t]he unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State." *Id.* *See also World-Wide Volkswagen*, 444 U.S. at 298, 100 S.Ct. at 567. Jurisdiction may not be manufactured by the conduct of others. Rather, "the defendant's conduct and connection with the forum State [must be] ... such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen*, 444 U.S. at 297, 100 S.Ct. at 567. Absent foreseeability of this sort, derived from purposeful contacts, it is irrelevant that a defendant could foresee the

likelihood that its product would arrive in the forum state. *Id.*

The focus on a defendant's own acts serves the underlying due process objective of fair notice, giving "a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." *Id.* Thus, a corporation may be subject to jurisdiction when it "delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State." *Id.* at 298, 100 S.Ct. at 567. But where contacts are of an "isolated" nature, the "reasonable foreseeability of litigation in the forum is substantially diminished." *Burger King*, 105 S.Ct. at 2184 n. 18. *See also id.* at 2189. Unique or insignificant relations with the forum suggest an absence of purposefulness, leading to the conclusion that subjecting the defendant to personal jurisdiction would be fundamentally unfair.

■■■ The contact between NANA and Virginia in this case was hardly so purposeful that litigation in Virginia could have been reasonably foreseen. NANA's ties with Virginia are virtually nonexistent; entirely so, apart from this single transaction. Although it is true that a single contractual relationship may furnish a basis for jurisdiction, *Burger King*, 105 S.Ct. at 2184 n. 18; *McGee v. International Life Insurance Co.*, 355 U.S. 220, 223, 78 S.Ct. 199, 201, 2 L.Ed.2d 223 (1957), the Court has

---

**2.** Preliminarily, in this diversity action, we must consider whether state law authorizes the exercise of jurisdiction. *Wolf v. Richmond County Hospital Authority*, 745 F.2d 904, 909 (4th Cir. 1984); *Hardy v. Pioneer Parachute Co.*, 531 F.2d 193, 195 (4th Cir.1976); *Bowman v. Curt G. Joa, Inc.*, 361 F.2d 706, 711 (4th Cir.1966). Defendant was found subject to personal jurisdiction under the provision of the Virginia long-arm statute governing any person "[c]ontracting to supply services or things in this Commonwealth." Va.Code § 8.01–328.1(A)(2). We are unaware of any federal or state decision giving a restrictive interpretation to this language, *cf. Elefteriou v. Tanker Archontissa*, 443 F.2d 185 (4th Cir. 1971), while the Virginia long-arm statute has been repeatedly construed to assert jur-

isdiction to the extent due process permits. *Brown v. American Broadcasting Co.*, 704 F.2d 1296, 1301 (4th Cir.1983); *Peanut Corp. v. Hollywood Brands, Inc.*, 696 F.2d 311, 313 (4th Cir. 1982). *See also Kolbe, Inc. v. Chromodern Chair Co.*, 211 Va. 736, 740, 180 S.E.2d 664, 667 (1971); *Carmichael v. Snyder*, 209 Va. 451, 456, 164 S.E.2d 703, 707 (1968) (decisions under prior statute). Thus, the state law and due process analyses are identical.

Plaintiff also relies upon several other provisions of the long-arm statute, not discussed by the district court. *See* Va.Code § 8.01–328.-1(A)(1), (4), (5). Even if these were applicable, a matter on which we need express no opinion, the limitations imposed by due process would remain unchanged.

expressly denied that an individual's contract with an out-of-state party can alone automatically establish sufficient minimum contacts. *Burger King*, 105 S.Ct. at 2185. It is essential that the contract relied upon have a "substantial connection" with the forum state. *McGee*, 355 U.S. at 223, 78 S.Ct. at 201. The factors considered in determining whether the defendant purposefully established minimum contacts with the forum include "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *Burger King*, 105 S.Ct. at 2186. In undertaking the minimum contacts analysis, it must be borne in mind that "unilateral activity of another party or a third person is not an appropriate consideration." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 104 S.Ct. 1868, 1873, 80 L.Ed.2d 404 (1984).

The attenuated contact here distinctly contrasts with the more "substantial and continuing relationship" described in *Burger King*, 105 S.Ct. at 2190. There, the Court found personal jurisdiction over a Michigan franchisee in the franchisor's home state, Florida. The defendant franchisee initiated dealings with the plaintiff Florida corporation to obtain the desired franchise, and "entered into a carefully structured 20-year relationship that envisioned continuing and wide-reaching contacts." *Id.* at 2186. Frequent communications passed between the franchisee in Michigan and the franchisor's Florida headquarters. *Id.* at 2187. Moreover, the franchise documents provided that all disputes would be governed by Florida law, giving the defendant fair notice that he might be subject to suit in Florida. *Id.* at 2187, 2190. Similarly, in *McGee*, the contacts were of a less transient nature. The life insurance contract in question remained in force over a period of several years, was delivered in the forum state, and the premiums were mailed from there. 355 U.S. at 221–23, 78 S.Ct. at 200–01.

If *Burger King* and *McGee* demonstrate what is sufficient in the realm of minimum contacts, this case demonstrates what is inadequate. The contract for reindeer antlers between Chung and NANA was finalized in Alaska, and though its essential terms were negotiated by telephone between Alaska and Virginia, those communications were initiated by Chung. NANA made no purposeful effort of its own to develop a market for its product in Virginia. It merely responded to Chung's unilateral inquiries. Payment for the antlers was tendered in Alaska at the time of sale. The parties entered into no agreements for a continuing business relationship beyond this single transaction in Alaska. Nothing in the parties' contract or course of dealing put NANA on notice that it might be haled into court in Virginia. NANA appears to have done everything possible to confine its United States business to its home state of Alaska during this transaction, and never had any other dealings with Virginia whatsoever. It only shipped goods to Virginia on this isolated occasion for the convenience of Chung, who could not remain in Alaska to take delivery there as originally contemplated by the parties.

It is immaterial, in this context, that NANA knew of the ultimate destination of the shipment, since the foreseeability of injury in a distant forum is not the touchstone of minimum contacts. *Burger King*, 105 S.Ct. at 2183; *World-Wide Volkswagen*, 444 U.S. at 295, 297, 100 S.Ct. at 566, 567. While it is only fair that a corporation seeking to create interstate business by its own endeavors be subject to suit wherever it extends its reach, as the "contacts proximately result from actions by the defendant *himself*," *Burger King*, 105 S.Ct. at 2184 (emphasis in original), it is equally necessary to protect an enterprise such as NANA which has not made such efforts, but only sells its product to direct purchasers in its home state. Predictability in structuring business dealings would otherwise be impaired, and fair notice give way to the whims of purchasers, leaving jurisdiction to rest on "random, isolated or fortuitous" circumstances. *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1984).

NANA has simply not sent its goods into the stream of interstate commerce with the minimal regularity due process demands.

Of course, as the Court has repeatedly stressed, we do not approach the "minimum contacts" analysis with an aim to propound any talismanic or mechanical test, and we recognize that the facts and circumstances of each case are determinative. *Burger King*, 105 S.Ct. at 2189; *Kulko v. California Superior Court*, 436 U.S. 84, 92, 98 S.Ct. 1690, 1696, 56 L.Ed.2d 132 (1978). This circuit has previously admitted that a single shipment of goods into the forum state may sometimes establish a jurisdictional basis. *See Ajax Realty Corp. v. J.F. Zook, Inc.*, 493 F.2d 818, 822–23 (4th Cir.1972), *cert. denied*, 411 U.S. 966, 93 S.Ct. 2148, 36 L.Ed.2d 687 (1973). In other cases, such a single shipment has been held inadequate for "minimum contacts" purposes. *See Erlanger Mills, Inc. v. Cohoes Fibre Mills, Inc.*, 239 F.2d 502, 507 (4th Cir.1956). Reasonableness and fairness are concepts inherently incapable of more precise definition, and, particularly in this area, "the shades are innumerable." *Kulko*, 436 U.S. at 92, 98 S.Ct. at 1697, *quoting Estin v. Estin*, 334 U.S. 541, 545, 68 S.Ct. 1213, 1216, 92 L.Ed. 1561 (1948). Examining with care all of the facts and circumstances here presented, we are not persuaded that it would be just to subject NANA to the jurisdiction of courts in Virginia, where its connections to the forum are not sufficiently purposeful but of an isolated and unsolicited character.

We are not dissuaded from this view by the district court's determination that NANA's failure to insure the reindeer antlers rendered it the party at fault. Personal jurisdiction is not to be determined by a peek at the merits, but established on independent grounds. While in this instance, due process may appear to protect a breaching defendant from suit in an injured plaintiff's state, in others it will safeguard defendants from baseless litigation in remote and unrelated forums. Courts have come to seek fairness in these fact-bound situations by requiring some modicum of purposeful contact with the forum involved.

We must also decline the dissent's invitation to chop NANA's course of conduct into small bits and fragments in an attempt to connect some single fragment with the breach. The fairness to a party demanded by due process requires here that we view NANA's activities in their entirety—activities which, apart from a single, chance happening in an Alaska airport, show no actual or desired connection with Virginia, the forum state.[3]

If a party's slightest gesture of accommodation were to impose personal jurisdiction, commercial dealings would soon turn unobliging and brusque. The dissent's suggestions that NANA refuse to ship the horn to Virginia or insist that Chung remain in Alaska or appoint an agent in Nome to take delivery all involve inconvenience to Chung. Concepts of *in personam* jurisdiction should not be structured to manufacture minimum contacts from every amenable act.

Because personal jurisdiction here fails the threshold test of "minimum contacts," we need not separately consider the convenience of any particular forum to the respective parties, although we note that it would seem equally burdensome for NANA to defend in Virginia as for Chung to sue in Alaska. Factors such as the burden on the defendant, the plaintiff's in-

---

**3.** The dissent suggests that we have used the wrong standard in determining whether NANA's contacts with Virginia were sufficient. The dissent says that "NANA need only have ' "fair warning that a particular activity may subject [it] to the jurisdiction of a foreign sovereign," ' " (*post*, p. 1130), and that " 'Fair warning' exists when a defendant has ' "purposefully directed" his activities at residents of the forum.' " (*post*, p. 1130).

We have said that " 'the defendant's conduct and connection with the forum State [must be] ... such that he should reasonably anticipate being haled into court there,' " (*supra* p. 1127), and that "The contact between NANA and Virginia in this case was hardly so purposeful that litigation in Virginia could have been reasonably foreseen." (*supra*, p. 1127). We see no meaningful distinction between the two formulations.

terest in obtaining effective relief, and the forum state's concern with adjudicating the dispute are generally addressed only after "it has been decided that a defendant purposefully established minimum contacts with the forum State," *Burger King,* 105 S.Ct. at 2184, although sometimes bearing on overall reasonableness. *Id. See also World-Wide Volkswagen,* 444 U.S. at 292, 100 S.Ct. at 564. Due process mandates at the outset some deliberate effort by the defendant to do business in the forum State, "thus invoking the benefits and protections of its laws." *Hanson,* 357 U.S. at 253, 78 S.Ct. at 1240. If a single unsolicited sale of reindeer antler to a Virginia resident in Alaska were held to constitute "minimum contacts," little would remain of the safeguard of personal liberty from jurisdictional abuse the due process clause affords.

Accordingly, the judgment of the district court sustaining personal jurisdiction is reversed. This case is remanded to afford Chung an opportunity to move for transfer of the case to a district court where it could have been brought. *See* 28 U.S.C. § 1406(a); *Goldlawr, Inc. v. Heiman,* 369 U.S. 463, 82 S.Ct. 913, 8 L.Ed.2d 39 (1962); *O'Neal v. Hicks Brokerage Co.,* 537 F.2d 1266, 1268 (4th Cir.1976).

REVERSED AND REMANDED.

ERVIN, Circuit Judge, dissenting:

In my opinion, the contacts in this case are sufficient to establish personal jurisdiction over a cause of action that "arise[s] out of or relate[s] to" these contacts. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 104 S.Ct. 1868, 1872, 80 L.Ed.2d 404 (1984). NANA purposefully entered into an agreement to ship its product into Virginia, and it profited from that shipment. Furthermore, it could have foreseen and easily taken steps to avoid this lawsuit. I therefore believe that NANA's contacts with Virginia meet the minimal

requirements for a constitutional assertion of personal jurisdiction. Accordingly, I respectfully dissent.

I.

Contacts which are insufficient to establish general jurisdiction over an out-of-state defendant may be sufficient to establish specific jurisdiction over him.[1] *Wolf v. Richmond County Hospital Authority,* 745 F.2d 904, 909 (4th Cir.1984), *cert. denied,* —— U.S. ——, 106 S.Ct. 83, 88 L.Ed.2d 68, (1985); *see also Helicopteros,* 104 S.Ct. at 1872, 1874 & n. 12. The instant case, unlike many of those in which jurisdiction has been denied, *see, e.g., Helicopteros,* 104 S.Ct. 1868; *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); *Wolf,* 745 F.2d 904, involves an exercise of specific jurisdiction. The majority erred in its failure to note this distinction, and in its implicit application of the "continuous and systematic" test for general jurisdiction to the contacts required in this case.

In order for specific personal jurisdiction to be constitutional, NANA's contacts do not have to rise to the "continuous and systematic" level required for general jurisdiction. *Helicopteros,* 104 S.Ct. at 1873. Rather, NANA need only have " 'fair warning that a particular activity may subject [it] to the jurisdiction of a foreign sovereign.' " *Burger King Corp. v. Rudzewicz,* —— U.S. ——, 105 S.Ct. 2174, 2182, 85 L.Ed.2d 528 (1985) (quoting *Shaffer v. Heitner,* 433 U.S. 186, 218, 97 S.Ct. 2569, 2587, 53 L.Ed.2d 683 (1977) (Stevens, J., concurring in judgment)). "Fair warning" exists when a defendant has " 'purposefully directed' his activities at residents of the forum," *id.* (quoting *Keeton v. Hustler Magazine,* 465 U.S. 770, 774, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1984) ), and the litigation results from injuries arising out of those activities. *Id.* The latter require-

---

1. "General jurisdiction" is the exercise of personal jurisdiction over a defendant in a suit not arising out of or related to the defendant's contacts with the forum. *Helicopteros,* 104 S.Ct. at 1872 n. 9. "Specific jurisdiction" is the exercise

of personal jurisdiction over a defendant in a suit that does arise out of or relate to the defendant's contacts with the forum. *Id.* at 1872 n. 8.

ment is obviously met by this lawsuit. The facts, properly construed, demonstrate that NANA's contacts also meet the "purposeful direction" requirement.

## II.

In its portrayal of NANA's contacts with Virginia as constitutionally inadequate, the majority misinterprets the situation surrounding the spoiled Virginia shipment. Chung did initially contact NANA and fly to Alaska to pick up the horn personally. If all had gone as planned, NANA would have followed its regular delivery practice and avoided its frequent problems of spoiled horn and inadequate insurance. *See* Deposition of John W. Schaeffer, President of NANA Corporation, Joint Appendix at 33 (Sept. 8, 1984) (delivery practice designed to limit NANA's responsibility for spoiled shipments). Under its regular delivery scheme, NANA's contacts with Virginia would arguably have been no more than " 'fortuitous' " and therefore insufficient to support an assertion of jurisdiction. *See* Majority Opinion, *supra* at 1128.

When Chung was preparing to leave Alaska, however, the situation changed. Chung, who had paid in full for 500 pounds of horn, expected delivery in full at the Nome Airport on June 14, 1982. NANA, however, was unable to meet its obligation and deliver on time. NANA then abandoned its regular delivery practice and voluntarily entered into a new agreement with Chung. Under this second agreement, NANA took responsibility for the safe arrival of 380 pounds of horn in Virginia.

This is not a case in which the 380 pounds of horn ended up in Virginia because of Chung's unilateral activity. *Cf. World-Wide Volkswagen*, 444 U.S. at 295–99, 100 S.Ct. at 566–68. In making the second agreement, NANA knowingly and purposefully availed itself of the privilege of shipping its product to a Virginian in Virginia. The Supreme Court recently stated that "even a single act can support jurisdiction" if the act has a " 'substantial connection' " with the forum. *Burger King*, 105 S.Ct. at 2184 n. 18 (quoting

*McGee v. International Life Insurance Co.*, 355 U.S. 220, 223, 78 S.Ct. 199, 201, 2 L.Ed.2d 223 (1957)). It is difficult to understand how a conscious decision to change an existing agreement and to alter a company's routine by shipping a specific batch of horn to a particular individual located in Virginia is not substantially connected with Virginia. *Cf. McGee v. International Life Insurance Co.*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957) (Texas corporation's reinsurance of one individual in California, through the assumption of the obligations of an Arizona corporation, was sufficient connection for the exercise of specific personal jurisdiction in California).

Contrary to the majority, I also believe that this litigation meets *World-Wide Volkswagen's* "foreseeability" test for minimum contacts. *See World-Wide Volkswagen*, 444 U.S. at 296–97, 100 S.Ct. at 566–67. Testimony from NANA's President indicates an awareness of and previous experience with the specific problems that arose in this case. *See* Deposition of John W. Schaeffer, *supra* p. 17. NANA purposefully directed its activity toward Virginia and should have "reasonably anticipate[d] being haled into court there." *World-Wide Volkswagen*, 444 U.S. at 297, 100 S.Ct. at 567. Furthermore, this case meets the Supreme Court's requirement that a defendant be able to alleviate the risk of litigating in an out-of-state forum. *See id.* NANA could simply have insured the package and thereby covered the loss. Alternatively, it could have refused to ship the horn to Virginia and refunded Chung's payment for 380 pounds. It could have insisted that Chung remain in Alaska to collect the horn or appoint an agent in Nome to take delivery and shipment responsibility for him. Given these options, the majority's assertion, *supra* at 1128, that "NANA appears to have done everything possible to confine its United States business to its home state of Alaska during this transaction" is plainly inaccurate.

In its second agreement with Chung, NANA abandoned its usual policies and

willingly shipped its product into Virginia. In so doing, it purposefully directed its activity to Virginia, thereby meeting the minimum contacts requirement for Virginia's assertion of specific personal jurisdiction.

### III.

Once minimum contacts are established, this court must consider whether an assertion of personal jurisdiction comports with " 'fair play and substantial justice.' " *Burger King,* 105 S.Ct. at 2184 (quoting *International Shoe v. Washington,* 326 U.S. 310, 320, 66 S.Ct. 154, 160, 90 L.Ed. 95 (1945) ). Some of the factors appropriately considered in this analysis are Virginia's interest in adjudicating this dispute and Chung's interest in obtaining convenient and effective relief. *Id.* Virginia's interest lies both in ensuring that the products supplied to its citizens are not worthless and in "providing effective means of redress for its residents." *McGee,* 355 U.S. at 223, 78 S.Ct. at 201. Chung's interest in litigating in his home state is obvious. Given these factors, assertion of personal jurisdiction in Virginia seems appropriate.

One factor, the burden on NANA of defending in Virginia, does tend to undermine the assertion of jurisdiction. *See Burger King,* 105 S.Ct. at 2184. A defendant who has purposefully directed his activities toward Virginia, however, "must present a compelling case" in order to escape personal jurisdiction. *Id.* at 2185. Mere claims of distance and inconvenience are properly handled in a motion for a change of venue, not a denial of personal jurisdiction. *Id.* In fact, the Supreme Court has required defendants to travel from Texas to California, *see McGee,* 355 U.S. at 224, 78 S.Ct. at 201, and from Michigan to Florida, *see Burger King,* 105 S.Ct. at 2188, to defend. The similar, although slightly more severe, complaints of distance and travel in this case simply do not rise to the level of unconstitutional burdensomeness. NANA's argument is not sufficiently compelling to make an otherwise appropriate assertion of personal jurisdiction unconstitutional.

As the foregoing discussion illustrates, NANA purposefully directed its actions toward Virginia, thereby establishing constitutionally sufficient minimum contacts with that state. No compelling circumstances make this otherwise appropriate exercise of personal jurisdiction unreasonable. The district court's assertion of specific personal jurisdiction over NANA was, therefore, proper. Consequently, I respectfully dissent.