ORANGEBURG PECAN COMPANY,
INC., Plaintiff,

v.

FARMERS INVESTMENT
CO., Defendant.

Civ. A. No. 5:93–1787–22.

United States District Court,
D. South Carolina,
Orangeburg Division.

July 11, 1994.

Robert P. Wood, Columbia, SC, for plaintiff.

John C.B. Smith, Jr., Columbia, SC, for defendant.

## ORDER

CURRIE, District Judge.

This action arises out of an alleged breach of a contract to supply pecans. Jurisdiction is based on diversity of citizenship pursuant to 28 U.S.C. § 1332(a). The matter is before the court on Defendant's Motion to Dismiss/or for Summary Judgment. Counsel for both parties submitted briefs, and on April 19, 1994, the court heard argument. The court directed counsel to file by May 10, 1994, any additional evidence or memoranda of law on the personal jurisdiction issue. Counsel for Plaintiff submitted additional evidence and copies of deposition extracts, and counsel for Defendant submitted a supplemental memorandum of law.

The court has carefully reviewed the entire record in this matter, and considered the arguments of fact and law cited by counsel at the April 19 hearing. The court finds that Defendant's Motion to Dismiss or for Summary Judgment should be denied as to the issue of lack of personal jurisdiction. The motion for dismissal of Plaintiff's Second Cause of Action based on the South Carolina

Unfair Trade Practices Act, S.C.Code Ann. § 39–5–10 *et seq.* (Law.Co-op.1976) will be held under advisement pending the filing of any additional information to be furnished on that issue by counsel, as ordered below, *see infra,* III. Unfair Trade Practices.

As to the motion to dismiss for lack of personal jurisdiction, the allegations of the complaint are to be taken as true insofar as they are not controverted by Defendant's affidavits; where affidavits of both parties contain contradictory factual allegations, those related in Plaintiff's complaint and affidavits will be accepted as true. *See Wolf v. Richmond County Hosp. Authority,* 745 F.2d 904, 908 (4th Cir.1984). Applying this standard, the court finds the following facts.

## I. FACTS

Plaintiff is a South Carolina pecan sheller that purchases lower-grade quality pecans and reworks the usable portions. It is incorporated in South Carolina and has its principal place of business there. Defendant is a large-scale Arizona pecan grower and processor. It has a wholly-owned subsidiary, Santa Cruz Valley Pecan Co., which is also located in Arizona and which is a pecan sheller. Defendant is an Arizona corporation that maintains businesses in Florida, Arizona and New Mexico. The instant dispute arose out of an alleged contract for the sale, F.O.B. Collect, of "reworkable"[1] pecans by Defendant to Plaintiff.

The pecan operations of both parties are primarily on the wholesale level. Although Plaintiff and Defendant could be characterized as competitors in the market, because their geographic sales areas do not typically overlap, they do not generally compete. From time to time, shortages of certain grades of pecans have prompted representatives of both parties to contact other pecan wholesalers in an attempt to fill the shortages through what may be described as an "accommodation trade," meaning pecans of one grade are swapped for pecans of another grade, or an "accommodation sale," meaning that pecans are purchased by one party from the other for a negotiated price. Defendant has made several such accommodation sales to South Carolina businesses. Between 1987–1993 Defendant sold 886,856 pounds of pecans to South Carolina businesses for a total invoice price of $1.4 million. (Def.Exh. F94). Of that $1.4 million sales, $167,429 was .to Plaintiff. During that same time, Defendant also traded pecans with a South Carolina business and shipped several sample pecans free of charge.

As a result of a shortage of pecan crops, in December 1992, Fred Felder, Sr., an employee of Orangeburg Pecan, contacted Don Nilsen, an employee of Santa Cruz Valley Pecan Co., in order to see if the latter had any off-grade pecans for sale. Nilsen responded that he did not have any at that time but would let Felder know if he acquired any. In April 1993, Nilsen called Felder to report that he had a quantity of off-grade shelled pecans available for purchase. Nilsen agreed to send Plaintiff a two-case sample, which is customary practice in the trade. The sample pecans arrived in Orangeburg in cases marked "Amber."[2] Based on the sample, Felder called Nilsen and ordered 2,700 30–pound cases (81,000 pounds total) of unprocessed pecan pieces. After some negotiation, the parties agreed on a price of $1.50 per pound for the pecans, for a total cost of $121,500. The pecans were to be shipped "F.O.B. Collect," which means that Defendant would make arrangements for the shipping but that Plaintiff would be responsible for paying the freight costs to the shipper upon the arrival of the goods in South Carolina. On May 7, 1993, Plaintiff accepted 2,700 cases of pecans. The shipment contained 850 cases of unprocessed amber pecans of a quality consistent with the sample and 1,850 cases of dark amber nut pieces. After inspection, Plaintiff accepted the 850 cases of amber pecans, accepted nine cases of the dark amber pecans for testing purposes, and rejected the balance. Defendant re-

---

1. At oral argument counsel for Defendant explained that reworking pecans involves cutting out the inferior portion and using the remainder in certain food products such as baked goods or pecan log rolls.

2. The record reflects that dark amber nuts are of a quality inferior to amber nuts.

claimed the nonconforming nuts in South Carolina on June 14–15, 1993. Plaintiff paid Defendant $1.50 per pound, for a total cost of $38,250 for the 850 cases of accepted amber nuts, and $405 for the nine cases of accepted dark amber nuts used for testing purposes. Plaintiff's payment checks were drawn on a South Carolina bank account and were deposited by Defendant in its bank account.

On or about June 17, 1993, Plaintiff commenced this action in the Court of Common Pleas for Orangeburg County. Plaintiff's complaint asserts two causes of action: (1) breach of contract, in which Plaintiff seeks to recover the difference between the cost of the pecans as allegedly contracted-for and the cost of replacement pecans, plus lost profits and other incidental and consequential damages; and (2) a violation of the South Carolina Unfair Trade Practices Act, S.C.Code Ann. § 39–5–10 *et seq.*, based on Plaintiff's allegation that Defendant intentionally shipped pecans to it that did not conform to the earlier sample, and that Defendant's purpose in doing this was to force Plaintiff to choose between either accepting the inferior pecans or paying the return shipping costs. Defendant removed this case to federal court on July 21, 1993.

Defendant now moves for an order dismissing this action or, in the alternative, for an order granting it summary judgment as to Plaintiff's claim under the South Carolina Unfair Trade Practices Act (UTPA). Defendant argues that the South Carolina long-arm statute, S.C.Code Ann. § 36–2–803, does not authorize the court to exercise jurisdiction over Defendant and that the Due Process Clause of the United States Constitution prohibits the court from exercising jurisdiction because Farmers has not created or maintained the requisite "minimum contacts" with South Carolina. Defendant urges that the exercise of jurisdiction would not be fair or reasonable. As to Defendant's alternative motion for summary judgment on the UTPA claim, Defendant argues that the UTPA does not apply to a claim such as this one, which is a private dispute between commercial entities that does not affect the public interest. Plaintiff responds that there are ample bases to exercise jurisdiction over Defendant both

under the South Carolina long-arm statute and the Due Process Clause. In addition, as to the UTPA claim, Plaintiff contends that unfair acts capable of repetition, such as Plaintiff alleges, satisfy the impact on the public interest requirement of the UTPA.

## II.  PERSONAL JURISDICTION

■ Evaluating the propriety of in personam jurisdiction over a nonresident defendant involves a two-step process. First, reference to the forum state long-arm statute is required in order to determine if a statutory basis exists sufficient to assert jurisdiction over the nonresident defendant. If the first step is satisfied, the next inquiry is whether the assertion of jurisdiction is consonant with the requirements of Fourteenth Amendment due process.

### A.  Long–Arm Statute

Plaintiff contends several provisions of the South Carolina long-arm statute confer jurisdiction. Section 36–2–803 provides, in pertinent part, that:

(1) A court may exercise personal jurisdiction over a person who acts directly or by an agent as to a cause of action arising from the person's

(a) transacting business in this State;

(b) contracting to supply services or things in the State;

\*      \*      \*      \*      \*      \*

(g) entry into a contract to be performed in whole or in part by either party in this State: or

(h) production, manufacture, or distribution of goods with the reasonable expectation that those goods are to be used or consumed in this State and are so used or consumed.

■ The long-arm statute extends South Carolina's jurisdiction as far as due process allows. *Atlantic Soft Drink v. South Carolina Nat'l Bank*, 287 S.C. 228, 336 S.E.2d 876 (1985). Although Defendant argues that it does not maintain a physical presence in South Carolina, "jurisdiction may not be avoided merely because the defendant did not physically enter South Carolina."

*Hammond v. Butler, Means, Evins & Brown,* 300 S.C. 458, 388 S.E.2d 796 (1990), *cert. denied,* 498 U.S. 952, 111 S.Ct. 373, 112 L.Ed.2d 335 (1990). The undisputed facts provide this court ample basis to conclude that Defendant's activities have subjected it to jurisdiction under § 36–2–803(1)(a), (b), (g), and (h).

Defendant knew Plaintiff was located in South Carolina and knew that a breach of the contract would cause injury to a South Carolina business. Defendant supplied Plaintiff with a two-case sample hoping to solicit a full order based upon Plaintiff's satisfaction with the sample. Indeed, based on the sample, Defendant's activities did generate the placement of an order by Plaintiff. There can be no doubt that Defendant's activities constituted "transacting business in this State."

Although Defendant has tried to make much of the fact that the pecans were shipped "F.O.B. Collect", an industry practice cannot defeat the practical application of the long-arm statute. The term "supply" as used in the long-arm statute subsection (b) means to provide goods to enter the [forum state]. *See Finest Fruits, Inc. v. Bertuca,* 714 F.Supp. 94 (S.D.N.Y.1989) (where goods were shipped "F.O.B. Arizona," court exercised jurisdiction over Arizona company based on New York long-arm statute provision because defendant contracted to supply goods into New York). Here Defendant supplied the two sample cases directly to Felder, and then followed up by arranging for the shipment of the principal order to South Carolina. The mere fact that Plaintiff paid the actual freight costs directly to the shipper cannot defeat Defendant's knowledge that its pecans would enter a South Carolina forum.

Similarly, it is clear that Defendant entered into a contract to be performed in whole or in part in South Carolina pursuant to subsection (g). Under the alleged contract, Plaintiff reserved the right to inspect the goods prior to paying for them. Inspection of the goods, Plaintiff's temporary holding of the rejected goods pending Defendant's reclaiming of them, and Plaintiff's subsequent partial payment for the accepted goods constituted performance of part of the contract in South Carolina. There can be no doubt as well that Defendant distributed the goods with the reasonable expectation that those goods were to be used or consumed in South Carolina, and that many of the conforming pecans were, in fact, so used and consumed (Affidavit of Felder, Sr. at 3). Defendant traded with Plaintiff for five years preceding the disputed sale and was familiar with the nature of Plaintiff's operations. Plaintiff's agent, Felder, had visited Defendant's Santa Cruz operation, and been entertained there. Defendant cannot claim ignorance of Plaintiff's operations and intended usage for the pecans.

For the foregoing reasons, the court concludes that personal jurisdiction over Defendant may be exercised pursuant to South Carolina's long-arm statute.

## B. Due Process

The exercise of personal jurisdiction is only permissible where the defendant purposely established minimum contacts in the forum state, *Asahi Metal Ind. Co., Ltd. v. Superior Court,* 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987); *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), such that exercise of jurisdiction does not offend "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Beginning with its decision in *World Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980), the United States Supreme Court has formulated a two-pronged test of minimum contacts. The first prong focuses on the purposeful affiliation of a nonresident defendant with the forum state and the relationship of the nonresident's forum state activity to the litigation. *Burger King Corp.,* 471 U.S. at 471–76, 105 S.Ct. at 2181–84. The second prong focuses on an evaluation of other factors to test whether an assertion of jurisdiction is "fair" or "reasonable." *Asahi,* 480 U.S. at 113, 107 S.Ct. at 1032; *Burger King Corp.,* 471 U.S. at 476–78, 105 S.Ct. at 2184–85.

Under the first prong examination, courts have analyzed the following three ele-

356

ments: (1) whether the defendant has engaged in activity by which he purposely avails himself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws, *Burger King Corp.*, 471 U.S. at 475, 105 S.Ct. at 2183; (2) whether defendant's conduct and connections with the forum state are such that he should reasonably anticipate being haled into court there, *id.* at 474, 105 S.Ct. at 2183; and (3) whether the defendant has purposefully directed his activities at residents of the forum, *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984), and whether the litigation results from alleged injuries that arose out of or relate to those activities, *Burger King Corp.*, 471 U.S. at 472–73, 105 S.Ct. at 2182. Where a defendant has purposefully directed his activities into the forum state, "he manifestly [avails] himself of the privilege of conducting business there, and because his activities are shielded by the benefits and protections of the forum's laws, it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well." *Id.* at 475–76, 105 S.Ct. at 2184. The presumption of reasonableness may, however, be enhanced or overcome by the examination of fairness factors such as the burden on the defendant, the plaintiff's interest in obtaining a convenient and effective relief, *Asahi,* 480 U.S. at 113, 107 S.Ct. at 1033, as well as the interstate judicial system's interest in securing an efficient resolution of the dispute, *id.*

In *Burger King* the Supreme Court determined that jurisdiction existed over a Michigan resident who entered into an ongoing franchise agreement with a Florida corporation. The agreement provided that all disputes would be governed by Florida law, which factor was important to the Court in *Burger King* because it gave defendant fair notice that he might be subject to suit in Florida under the agreement. *Burger King,* 471 U.S. at 481, 105 S.Ct. at 2186–87.

■ Applying the foregoing principles to the instant case, the court finds an adequate basis to conclude defendant had sufficient minimum contacts with South Carolina under the first prong test. The record reflects that since 1987 alone, Defendant has sold tons of pecans, at a sales price of $1.4 million, to two South Carolina customers, Young Pecan Company of Florence, South Carolina and Plaintiff. (Def.Exh. F94). Defendant's employees have visited South Carolina at least four times (Def.Exh. F130, 131, 133, 188); have made telephone calls from South Carolina (*id.*); have received 51 toll-free WATS line calls from South Carolina in one nine-month period (Def.Exh. F141–150; and have placed approximately 68 calls to South Carolina. Further, Defendant has on at least one occasion shipped 21,000 pounds of pecans with a value of $79,170 to the Netherlands via the Port of Charleston, South Carolina (Def.Exh. F99–116), using a South Carolina trucking firm in the process (Def.Exh. F115–116). It also directs an annual mailing to at least 133 South Carolinians who have visited its retail outlet in Arizona and whose names were placed on Defendant's mailing list (Def.Exh. F96–99).

Although most of Defendant's sales to South Carolina customers were conducted as accommodations to pecan wholesalers who were experiencing shortages of certain quality pecans, nothing in the record reflects that the sales were for less than full market price or that Defendant was reluctant to do business with those entities. Moreover, Nilsen testified that on occasion Defendant would swap pecans with another South Carolina wholesaler, Young's, thus evidencing a real benefit received by Defendant's connections with the forum state. (Deposition of Wilson at 11).

With respect to the relationship and activities between the parties to this suit and which ultimately culminated in the instant controversy, the court concludes that Defendant has purposefully directed its activities at South Carolina residents to a sufficient degree to exercise jurisdiction over Defendant. This is particularly so because the instant litigation is to redress injuries that arose out of Defendant's activities in this forum. "Prior negotiations and contemplated future consequences, along with terms of the contract and the parties' actual course of dealing, ... must be evaluated in determining whether the defendant purposefully es-

tablished minimum contacts with the forum." *Burger King*, 471 U.S. at 479, 105 S.Ct. at 2185. Even "a single contract with the forum state is sufficient transacting of business to give its courts personal jurisdiction over a nonresident if the contract gives rise to or figures prominently in the cause of action under consideration." *Berkeley PG Corp. v. South Bank Inv. Group, Inc.*, 291 S.C. 315, 320, 353 S.E.2d 305, 308 (Ct.App.1987).

■ For purposes of due process analysis, each assertion of personal jurisdiction is to be tested on a case-by-case basis. *Peanut Corp. of America v. Hollywood Brands, Inc.*, 696 F.2d 311 (4th Cir.1982). The record reflects the two parties have been doing business together at least since early 1987 (Def.Exh. D1, F193). Although Defendant has attempted to portray its contacts with Plaintiff as sporadic, accommodation sales only, it is clear that both Plaintiff and Defendant knew each other as reliable sources of "bartered-for" or "for-sale" pecans.

On January 21, 1987, Defendant sold 90 pounds of shelled pecans to Plaintiff. Defendant invoiced Plaintiff $187.08 for the lot, which had been shipped "F.O.B. Orangeburg," which means freight prepaid (Def.Exh. F193). In February 1987 Defendant sold Plaintiff 39,910 pounds of oil stock pecans for $3,991 (Def.Exh. F192). In early 1987, Plaintiff's representative, Felder, visited Defendant's Santa Cruz shelling plant and orchard. As part of the visit, Nilsen showed Felder the facilities, held a cocktail party for Felder, and treated Felder and his wife to a Mexican dinner. Defendant took an income tax deduction for such entertainment expenses (Nilsen Depo., at 9–10). The foregoing activities demonstrate Defendant's desire to cultivate its connections with another South Carolina pecan business.

Shortly after the Arizona trip, Defendant sold Plaintiff additional pecans, for a total invoice price of $7,803 (Def.Exh. F191–192). In 1989, Defendant's sales to Plaintiff totaled $155,448 (Def.Exh. 94). Between the period

1987–1993 Defendant's sales to Young Pecan Co. totaled nearly $1.2 million (Def.Exh. F94). Thus, even before the events giving rise to this dispute occurred in 1993, Defendant had done $167,429 of business with Plaintiff and $1.2 million of business with Young Pecan Co.

Although Defendant has argued that the sales to South Carolina businesses did not comprise a significant portion of Defendant's annual revenues of approximately $40 million dollars, this court knows of no authority directing this court to apply a mere mathematical equation in the resolution of a delicate due process analysis governing personal jurisdiction. If Defendant's argument were adopted, large-scale businesses with sales generated in widespread areas would be shielded from suit in most states.

With respect to the disputed shipment that is the genesis of this lawsuit, Defendant would have received $121,500 for the shipment had all gone as planned. On this record the court finds that Defendant intended to and did engage in significant forum state activity. Moreover, it is presumptively not unreasonable to require Defendant to submit to the burdens of litigation in this forum. *Burger King Corp.*, 471 U.S. at 475–76, 105 S.Ct. at 2183–84.

■ The court's examination of the second prong, or fairness, factors similarly compels the conclusion that due process permits the exercise of jurisdiction over Defendant in South Carolina. Although affidavits and deposition extracts of Defendant's representatives have been submitted, no evidence of record states that the exercise of jurisdiction over Defendant would inconvenience it. Defendant has had its representatives in South Carolina on several occasions, whereas Plaintiff has, with the exception of the one visit by Felder, never had a representative in Arizona. Moreover, because the court finds this contract, if proved, may well be governed by South Carolina law[3], the interstate judicial

---

**3.** It appears the last act required for acceptance of the purported contract was performed in South Carolina by Felder's telephonic acceptance of the two-case sample and placing of an order. Thus, the contract would be governed by

South Carolina law. *See Askins v. Firedoor Corp. of Florida*, 281 S.C. 611, 316 S.E.2d 713 (Ct.App. 1984).

In *Burger King* the Court found that an express governing law provision in the agreement dem-

system's interest in efficient resolution of controversies militates toward having a South Carolina forum address issues of South Carolina law. *Asahi,* 480 U.S. at 113, 107 S.Ct. at 1032–33.

The court's conclusion to exercise personal jurisdiction over Defendant is compelled based on a review of the law of this circuit. In *Vishay Intertechnology, Inc. v. Delta International Corp.,* 696 F.2d 1062 (4th Cir. 1982), the Fourth Circuit found due process was not infringed by the assertion of personal jurisdiction over a California corporation where it was otherwise subject to the North Carolina long-arm statute and had initiated the contact. There, the California corporation's contacts were limited to three letters and five telephone calls, and the California business maintained no place of business in North Carolina, had no agent in North Carolina, and had never entered into a contract there. Defendant's ongoing contacts and entry into several contracts with South Carolina businesses are much more extensive than the contacts of the California corporation in *Vishay.*

In another case involving nuts, the court exercised personal jurisdiction over an Illinois corporation where the corporation solicited some business in Virginia by advertising; telephonic conversations were held with a Virginia participant; a letter which became part of the basic contract was directed to Virginia; Virginia customers were billed directly by the corporation; defendant's products were distributed to two locations in Virginia; and the corporation regularly contacted Virginia peanut concerns. *See Peanut Corp. of America v. Hollywood Brands, Inc.,* 696 F.2d 311 (4th Cir.1982). Defendant's actions of distributing products in the state, maintaining ongoing connections with other nut businesses, and conducting some mailings into the state are similar to the defendant's actions in *Peanut Corp.*

The court has reviewed the authority cited by Defendant, including particularly *Chung v. NANA Dev. Corp.,* 783 F.2d 1124 (4th Cir.1986), *cert. denied,* 479 U.S. 948, 107 S.Ct. 431, 93 L.Ed.2d 381 (1986), and finds it distinguishable. *Chung* involved an alleged breach of a contract for the sale of reindeer antlers from defendant NANA, an Alaska corporation, to the plaintiff, a Virginia resident. *Chung* initiated the negotiations by telephoning NANA's Alaska offices. The parties agreed that 500 pounds of reindeer antlers. be sold to the plaintiff on the condition that they be received by the plaintiff in Nome, Alaska, the defendant's home forum. Although Chung received 120 pounds of antlers in Alaska, because the balance of antlers were not available as originally agreed upon, NANA shipped the remaining 380 pounds of antlers to the plaintiff in Virginia. Upon arrival in Virginia, the antlers had spoiled, had leaked blood, and emitted a terrible odor. The Fourth Circuit found exercise of jurisdiction by the Virginia district court to be in violation of due process because the defendant did not have the requisite minimum contacts with Virginia.

In contrast to the isolated sale between the parties at issue in *Chung,* the present record demonstrates a course of dealing spanning at least five years between Plaintiff and Defendant. Although Plaintiff's representative may have initially approached Nilsen in December 1992 about the sale of reworkable pecans, the subsequent lapse of several months, followed by Nilsen's call to offer Plaintiff suitable pecans, demonstrates that both parties possessed equal interest in contracting. *Chung* is also distinguishable because there the defendant never solicited any business in the forum state, payment was made in Alaska in person, defendant's usual business practice was to sell its product only to direct customers in its home state, and the

onstrated the defendant's knowledge that it might be brought into court in that forum. Although the instant case does not involve an express contract provision providing for the application of South Carolina law to any controversy arising out of the alleged contract, Defendant's knowledge that it was engaging in significant contract activities such as the shipping of samples and the negotiation of sales price with a South Carolina wholesaler is sufficient to evidence Defendant's general awareness that such activities might be governed by South Carolina law in any controversy arising out of its transactions. This is particularly so because Defendant is a sophisticated business enterprise with a revenue base over the four year period 1989–92 of approximately $160,000,000.

plaintiff received some antlers in Alaska with the balance shipped to Virginia only upon the defendant's inability to supply the entire sale in Alaska. Here, however, Defendant has for several years traded predictably with at least two South Carolina pecan wholesalers, including Plaintiff, for gross sales of well over one million dollars, and has directed annual mailings to at least 133 South Carolina residents. Defendant cannot now be heard to claim that it has purposefully limited its operations to its home state.

Accordingly, the court finds that the exercise of personal jurisdiction over Defendant comports with due process.

### III. UNFAIR TRADE PRACTICES

■ Although Defendant's brief argues that Plaintiff's claim under the South Carolina Unfair Trade Practices Act fails as a matter of law, see Rule 12(b)(6), Fed.R.Civ.P., because the transaction at issue does not have the requisite public impact, Defendant's motion seeks summary judgment pursuant to Rule 56(b), Fed.R.Civ.P. Before this court may convert a Rule 12(b)(6) motion into a motion for summary judgment, the parties must receive a reasonable opportunity to present all pertinent materials. *Herbert v. Saffell,* 877 F.2d 267 (4th Cir.1989).

At oral argument on April 19, 1994, Plaintiff's counsel sought to obtain certain information relevant to prior lawsuits against Defendant that might have a bearing on the UTPA claim. Specifically, Plaintiff sought to discover if Defendant's alleged conduct of intentionally shipping nonconforming goods to customers in an attempt to coerce the customers to accept nonconforming goods was capable of repetition within the meaning of the Unfair Trade Practices Act, *see Noack Enterprises, Inc. v. Country Corner Interiors,* 290 S.C. 475, 351 S.E.2d 347 (Ct.App. 1986), *cert. dismissed,* 294 S.C. 235, 363 S.E.2d 688 (1987) (a dispute between private parties in a commercial transaction involving alleged deceptive or unfair acts or practices can be cognizable under the UTPA if there is potential for repetition of the acts or practices), as long as there is an impact upon the public interest, *see Florence Paper Co. v. Orphan,* 298 S.C. 210, 379 S.E.2d 289 (1989).

Counsel for Defendant agreed to furnish Plaintiff's counsel with such information. Because the court finds that the information to be furnished to Plaintiff's counsel may have a bearing on Defendant's motion pursuant to Rule 56, Fed.R.Civ.P., counsel for both parties are ordered to submit, within ten days of the filing date of this order, any additional evidence concerning the UTPA claim. Once the court has received all the pertinent evidence, the court will issue a supplemental order addressing that claim.

### IV. CONCLUSION

IT IS ORDERED that Defendant's Motion to Dismiss this action pursuant to Rule 12(b)(2) is denied; and it is

FURTHER ORDERED that counsel submit additional evidence concerning the Unfair Trade Practices Act claim within ten (10) days of the filing date of this order.