Beverly **LESNICK,** Individually and as Personal Representative of the Estate of Stanley S. Lesnick, Plaintiff–Appellant,

v.

**HOLLINGSWORTH & VOSE CO.,** Defendant–Appellee,

and

Lorillard, Inc., Defendant.

No. 93–1820.

United States Court of Appeals, Fourth Circuit.

Argued May 9, 1994.

Decided Sept. 19, 1994.

**ARGUED:** Howell Kenneth Rosenberg, Brookman, Rosenberg, Brown & Sandler, Philadelphia, PA, for appellant. Andrew James McElaney, Jr., Nutter, McClennen & Fish, Boston, MA, for appellee. **ON BRIEF:** Steven J. Cooperstein, Brookman, Rosenberg, Brown & Sandler, Philadelphia, PA; Marc S. Rosen, Scanlan & Rosen, P.A., Baltimore, MD, for appellant. Stephen J. Brake, Nutter, McClennen & Fish, Boston, MA, for appellee.

Before MURNAGHAN and NIEMEYER, Circuit Judges, and HILTON, United States District Judge for the Eastern District of Virginia, sitting by designation.

Affirmed by published opinion. Judge NIEMEYER wrote the opinion, in which Judge MURNAGHAN and Judge HILTON joined.

## OPINION

NIEMEYER, Circuit Judge:

After her husband died from lung cancer, Beverly Lesnick instituted this action in the District of Maryland, alleging that the filters in Kent brand cigarettes manufactured by defendants Lorillard, Inc., and Hollingsworth & Vose Co. were the cause of her husband's death. In particular, she alleged that his death was caused by asbestos incorporated by the defendants into Kent brand cigarettes' "Micronite Filter" between 1952 and 1956. Hollingsworth & Vose, a Massachusetts corporation which manufactured the filter material in Massachusetts and shipped it to Lorillard's plants in Kentucky and New Jersey, filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(2) on the grounds that it did not have sufficient contacts with the state of Maryland for a Maryland court to assert personal jurisdiction over it. The district court granted the motion to dismiss, and we affirm.

### I

Stanley Lesnick, a Maryland resident, smoked approximately one and one-half to two packs of cigarettes each day from the 1940's until he quit smoking in the early 1970's, and he smoked Kent brand cigarettes from the time they were introduced on the market in the early 1950's until he quit. Lesnick purchased most of his cigarettes from retail stores in the state of Maryland. In May 1989, Lesnick was diagnosed with mesothelioma, a form of lung cancer. His doctor concluded that the cancer was caused by inhalation, not of the tobacco smoke, but of crocidolite asbestos, which was incorporated in the Kent cigarettes' filters in the early 1950's. Lesnick's condition was diagnosed as fatal, and on November 21, 1989, he died.

Beverly Lesnick, Stanley's wife, filed this diversity action in December 1991 in her individual capacity and as the representative of Stanley Lesnick's estate, naming as defendants Lorillard, Inc., a New York corporation with its principal place of business in New York, and Hollingsworth & Vose Co., a Massachusetts corporation with its principal place of business in Massachusetts. The amended complaint alleged that from March 1952 to May 1956, Lorillard manufactured Kent cigarettes with the "Micronite Filter," which contained crocidolite asbestos. The filter medium was manufactured by Hollingsworth & Vose in Massachusetts and was then shipped to Lorillard's cigarette manufacturing plants in Kentucky and New Jersey where it was incorporated into the cigarettes. Between 1952 and 1956, Hollingsworth & Vose provided Lorillard with material for approximately 10 billion asbestos-containing filters which were incorporated into cigarettes marketed and distributed by Lorillard throughout the nation. In her complaint, Beverly Lesnick alleged that the defendants knew or should have known of the dangers of crocidolite asbestos at the time the cigarettes and filters were manufactured, but that they failed to make improvements in them or to warn the public of these dangers. She based her claims on Maryland theories of negligence, strict liability, fraudulent misrepresentation, negligent misrepresentation, and breach of express warranty, and she demanded $2 million in damages.

Hollingsworth & Vose filed a motion to dismiss for lack of personal jurisdiction. It recognized that Maryland authorizes long-arm jurisdiction to the full extent allowed under the Due Process Clause of the Fourteenth Amendment, *Mohamed v. Michael,* 279 Md. 653, 370 A.2d 551 (1977), but it argued that under the reasoning of the Supreme Court plurality in *Asahi Metal Industry Co. v. Superior Court of California,* 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987), jurisdiction may not be asserted over an out-of-state manufacturer of products placed into the stream of commerce, where the manufacturer's only connection with the forum state is its knowledge that the products will eventually be sold there. Hollingsworth & Vose acknowledged that, when it sold the material for cigarette filters to Lorillard, it placed the material in commerce knowing that it would eventually be sold in Maryland as a component of Kent cigarettes;

however, it argued that under *Asahi,* mere knowledge is not enough to establish personal jurisdiction, and its activity must have been purposefully directed toward Maryland.

In support of her argument that Hollingsworth & Vose should be subject to Maryland's long-arm jurisdiction, Beverly Lesnick argued first that language in *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 298, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980), which appears to require only that a defendant place a product "into the stream of commerce with the expectation that [it] will be purchased by consumers in the forum State," should control, and based on admissions from Hollingsworth & Vose, Maryland's jurisdiction over Hollingsworth & Vose is properly asserted. Even assuming that *Asahi* is read to make the standard more demanding, Lesnick argued, jurisdiction would nevertheless be proper because Hollingsworth & Vose was "no mere supplier of component parts." Rather, it "bound itself to work in virtual partnership with Lorillard to develop a filter for general distribution through integration into Lorillard's cigarettes." Lesnick contended that Hollingsworth & Vose should be imputed with Lorillard's clearly adequate contacts with Maryland because it "purposefully availed itself of the privilege of conducting business, through Lorillard's sales, in the entire United States."

The district court rejected the argument that Hollingsworth & Vose's ties to Lorillard were sufficient to establish jurisdiction, though it acknowledged that Hollingsworth & Vose was an important, perhaps even vital, supplier to Lorillard. The court stated, "Hollingsworth & Vose Company is not engaged directly, as is Lorillard, in bringing the alleged offending product into Maryland, or doing anything with respect to Maryland, other than supplying its product to defendant Lorillard in a state other than Maryland." The court granted Hollingsworth & Vose's motion to dismiss under Federal Rule of Civil Procedure 12(b)(2) and entered final judgment in its favor under Federal Rule of Civil Procedure 54(b). This appeal followed.

II

While the jurisprudence of personal jurisdiction has focused on fixing the minimum measurement of a person's contact with a state necessary to substitute for the person's presence in the state and thus to justify that state's imposing an *in personam* judgment over the person, the immediate concept of "presence" is no longer part of the language. Nevertheless, the establishment of a surrogate for presence has been the core task in defining the due process boundaries of a state's legitimate exercise of sovereignty over a person beyond its borders. A historical review of the scope of a state's jurisdictional power thus provides an insight into the Supreme Court's efforts in articulating a standard for long-arm jurisdiction.

■ It remains well-established that a state's sovereignty over persons, property and activities extends only within the state's geographical borders and that therefore its laws have no operation in another state except as allowed by the other state or by comity. *See Pennoyer v. Neff,* 95 U.S. 714, 720–22, 24 L.Ed. 565 (1878). This root principle is inherent in our system of federalism. As the Court in *Pennoyer* stated:

> The several States are of equal dignity and authority, and the independence of one implies the exclusion of power from all others. And so it is laid down by jurists, as an elementary principle, that the laws of one State have no operation outside of its territory, except so far as is allowed by comity; and that no tribunal established by it can extend its process beyond that territory so as to subject either persons or property to its decisions.

*Id.* at 722. The Court noted that the assertion by one state of jurisdictional power in violation of these principles would be "an illegitimate assumption of power," *id.* at 720, and would not constitute due process of law in violation of the Fourteenth Amendment. *Id.* at 733.

Preserving the notion that only a person *present* in a state can be subjected to an *in personam* judgment there, the Court later concluded that corporations, even though previously thought to be present only where incorporated, were present in states where their authorized agents conducted the corpo-

rations' activities. *St. Clair v. Cox,* 106 U.S. 350, 1 S.Ct. 354, 27 L.Ed. 222 (1882). In *St. Clair,* the Court upheld a Michigan statute that permitted a foreign corporation to be sued in the state as a condition of that corporation's doing business in the state. The Court reasoned that the corporation's presence, through its agents, constituted implied consent to be sued there in accordance with the state's statute. *See also Philadelphia & Reading Ry. Co. v. McKibbin,* 243 U.S. 264, 37 S.Ct. 280, 61 L.Ed. 710 (1917) (holding that out-of-state corporation's in-state business may be so extensive as to imply physical presence in state).

Because the articulation of the "presence in a state" necessary to personal jurisdiction over the person was too limited for the increasing demands of interstate commerce and an expanding economy, the Supreme Court eventually adopted a more flexible approach that recognized a state's jurisdictional power over a person not only when the person is present in the state, but also when the person conducts meaningful activity there even if not physically present. *See Hanson v. Denckla,* 357 U.S. 235, 251, 78 S.Ct. 1228, 1238, 2 L.Ed.2d 1283 (1958). This modern approach, which began in 1945, focuses on an out-of-state person's contacts with the forum state coupled with notions of fairness in asserting jurisdiction over that person. *See International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945); *McGee v. International Life Insurance Co.,* 355 U.S. 220, 222, 78 S.Ct. 199, 200–01, 2 L.Ed.2d 223 (1957). Even though the Court in *International Shoe* recognized for the first time an expanded state power to exercise jurisdiction over a person not physically "present" there, its holding was rooted in finding a suitable analogy for the "presence" of the out-of-state party. *International Shoe* expressly relied on, and did not overrule *Pennoyer v. Neff,* noting that "the terms 'present' or 'presence' are used merely to *symbolize* those activities of the corporation's agent within the state which the courts will deem to be sufficient to satisfy the demands of due process." *International Shoe,* 326 U.S. at 316–317, 66 S.Ct. at 158 (emphasis added). Establishing a theoretical structure on which to justify the minimum contacts doctrine, the Court stated,

> "Presence" in the state . . . has never been doubted when the activities of the corporation there have not only been continuous and systematic, but also give rise to liabilities sued on, even though no consent to be sued or authorization to an agent to accept service of process has been given.

*Id.* at 317, 66 S.Ct. at 159. It also noted the obverse, pointing out that the "casual presence of a corporate agent or even his conduct of single or isolated items of activities in a state in the corporation's behalf are not enough to subject it to suit on causes of action unconnected with the activities there." *Id.* "But to the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state." *Id.* at 319, 66 S.Ct. at 160. Requiring a corporation to respond to litigation arising from those activities can "hardly be said to be undue" for purposes of the Due Process Clause. *Id.* Thus, notwithstanding the physical absence of a person from the territorial limits of the state, the defendant in *International Shoe* was subject to suit there.

■ *International Shoe* leaves us with a two-pronged requirement for asserting jurisdiction over a person not present in a state. The person must (1) have certain minimum contacts or ties with the forum state such that (2) maintenance of the suit does not offend traditional notions of fair play and substantial justice. *Id.* at 316, 66 S.Ct. at 158. Thus, while *International Shoe* expands upon the notion of "presence" to provide flexibility to accommodate the increased flow of commerce between the states, *see Hanson,* 357 U.S. at 251, 78 S.Ct. at 1238, 2 L.Ed.2d 1283 (1958), the standard for imposing jurisdiction over persons outside the state has remained one that depends on a measure of the person's activity *in the state* coupled with the constraint that the state's exercise of such power would not offend traditional notions of fair play.

In the years since *International Shoe,* the Court has further refined the definition of "minimum contacts." In *Hanson,* the Court limited those "minimum contacts" necessary

to confer jurisdiction to those activities of an out-of-state person by which the person "purposely avails itself of the privilege of conducting activities within the forum state." 357 U.S. at 253, 78 S.Ct. at 1239. This occurs where the contacts "proximately result from actions by the defendant *himself* that create a 'substantial connection' with the forum state," *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985) (quoting *McGee*, 355 U.S. at 223, 78 S.Ct. at 201) (emphasis in original), or where the defendant's efforts are "purposefully directed" at the state. *Id.* at 476, 78 S.Ct. at 2184. This test is not to be applied mechanically; it "must depend rather upon the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure." *International Shoe*, 326 U.S. at 319, 66 S.Ct. at 160.

These modern principles of personal jurisdiction do not, and indeed under the Constitution could not, reorder the separate sovereignties of the states. A state's jurisdictional power remains territorial, to be exercised within its boundaries over persons, property and *activities* there. Rather, these principles focus on the nature and quality of contacts with the state to determine whether they justify the state's exercise of its judicial power over the person.

Two relatively recent Supreme Court cases, without overruling the foregoing principles, have addressed personal jurisdiction issues in the products liability context with additional language that has reopened the discussion of long-arm jurisdiction's reach. In *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980), a married couple who, after having purchased a new Audi automobile from a dealer in New York, were on their way to their new residence in Arizona, were involved in an accident in Oklahoma, resulting in severe injuries to the wife and the couple's two children. The couple brought suit in Oklahoma against the New York dealer and the New York distributor, claiming that design defects in the automobile contributed to the plaintiffs' injuries. While the plaintiffs acknowledged that the two New York corpora-

tions were present and did business only in New York, they argued that Oklahoma's exercise of jurisdiction over the New York corporations was appropriate because of the mobile nature of the automobile and the foreseeability that some cars these corporations sold would find their way into Oklahoma. The Supreme Court, however, rejected the argument, ruling that the exercise of personal jurisdiction over the New York corporations by an Oklahoma court would violate the Fourteenth Amendment. It reached this conclusion because the New York corporations directed no activity to Oklahoma. As the Court said,

> [they] avail themselves of none of the privileges and benefits of Oklahoma law. They solicit no business there either through salespersons or through advertising reasonably calculated to reach the State. Nor does the record show that they regularly sell cars at wholesale or retail to Oklahoma customers or residents or that they indirectly, through others, serve or seek to serve the Oklahoma market.

444 U.S. at 295, 100 S.Ct. at 566. While this reasoning, focusing upon the defendants' actual contacts with Oklahoma, is consistent with the Court's earlier jurisprudence, the Court elsewhere discussed the type of foreseeability which is critical as an element of minimum contacts. Rejecting the notion that foreseeability based on a "mere likelihood" that a product would find its way to the forum state could establish jurisdiction, the Court stated instead that the person should "reasonably anticipate being haled into court there." *Id.* at 297, 100 S.Ct. at 567. The Court then stated:

> The forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State.

*Id.* at 297–98, 100 S.Ct. at 567.

Notwithstanding the breadth of this "stream of commerce" language, the entire opinion indicates that the Court has not abandoned the notion that jurisdiction must rest on a person's activity *deliberately direct-*

ed toward the forum state. The Court acknowledged that defendants must be allowed "to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." 444 U.S. at 297, 100 S.Ct. at 567. Echoing the same theme, the Court noted that "[w]hen a corporation 'purposefully avails itself of the privilege of conducting activities within the forum State,' *Hanson*, 357 U.S. at 253, 78 S.Ct. at 1239, *it has clear notice that it is subject to suit there*, and can act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the state." *Id.* (emphasis added).

In sum, the *World–Wide Volkswagen* Court's repeated reliance upon the fact that defendants, who did not direct any of their activities toward Oklahoma, could not have anticipated being subject to the jurisdiction of Oklahoma courts, leads us to believe that we should not read the "stream of commerce" language out of context. While *World–Wide Volkswagen* has been cited for the proposition that personal jurisdiction may follow a product if it is delivered "into the stream of commerce with the expectation that [it] will be purchased by consumers in the forum state," *see, e.g., Bean Dredging Corp. v. Dredge Technology Corp.*, 744 F.2d 1081 (5th Cir.1984), *Nelson v. Park Industries, Inc.*, 717 F.2d 1120 (7th Cir.1983), *cert. denied*, 465 U.S. 1024, 104 S.Ct. 1277, 1278, 79 L.Ed.2d 682 (1984), we read the holding of the case to be much narrower, requiring purposeful activity on the part of the defendants to establish a meaningful contact with the forum state.

In *Asahi Metal Industry Co. v. Superior Court of California*, 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987), the Court attempted to throw additional light on *World–Wide Volkswagen*'s language that a mere placement of goods "in the stream of commerce" subjects a plaintiff to suit in any state where the goods might foreseeably cause injury, but its efforts were inconclusive. In *Asahi*, a Californian who was injured in a motorcycle accident when his rear tire tube exploded filed suit against a Taiwanese man-

ufacturer of the tube, which in turn impleaded Asahi, a Japanese company which manufactured and supplied the tube's valve assembly. Although Asahi acknowledged that it was aware that its valve assemblies would eventually be sold on motorcycles throughout the United States, it asserted that it never expected to be subject to suit in the United States, since all of its sales flowed from Japan to Taiwan. Relying on the second prong of *International Shoe*, a unanimous Supreme Court concluded that California's assertion of jurisdiction over Asahi would be unconstitutional. It held that the assertion of such jurisdiction would "offend traditional notions of fair play and substantial justice," taking into account the burden on Asahi to defend an American suit and California's minor interest in deciding whether Asahi would have to indemnify the Taiwanese manufacturer. *Id.* at 114, 107 S.Ct. at 1033. The Court also noted that the "unique burdens placed upon one who must defend oneself in a foreign legal system" counsel strongly in favor of finding no jurisdiction. *Id.* at 114, 115, 107 S.Ct. at 1033, 1034.

Addressing the question of whether Asahi maintained "minimum contacts" with California sufficient to satisfy the first prong of *International Shoe*, the Court produced three opinions, none of which mustered majority support. Justice O'Connor, joined by Chief Justice Rehnquist and Justices Powell and Scalia, recognized that the language of *World–Wide Volkswagen* might be read to allow jurisdiction over *any* manufacturer which is aware that its product may be sold in the forum state. She noted, however, that some courts had rejected so broad an interpretation of *World–Wide Volkswagen*, reading it to require more of the defendant than mere knowledge of the product's entry into the forum state through the stream of commerce. She sided with those courts:

> The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum

State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State. But a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State.

480 U.S. at 112, 107 S.Ct. at 1032 (O'Connor, J.). Thus, even though Asahi may have been aware that its products would be sold in California, its lack of conduct directed specifically at California made jurisdiction in California improper under a "minimum contacts" analysis.

Justice Brennan, joined by Justices White, Marshall and Blackmun, concluded that *World–Wide Volkswagen* should not be read to require "additional conduct" beyond simply placing a product in the stream of commerce with the expectation that it will be purchased in the forum state. As Justice Brennan continued, "As long as a participant in this process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise." *Id.* at 117, 107 S.Ct. at 1034 (Brennan, J.).

Justice Stevens, the swing vote, joined Justice O'Connor's opinion except with regard to the minimum contacts issue. He refused to join that aspect of the case because it was not necessary to the decision of the Court in view of its reliance on the second prong of *International Shoe.* In addition, "even assuming that the test ought to be formulated here," Justice Stevens concluded that Justice O'Connor's opinion "misapplies [the test] to the facts of this case." *Id.* at 122, 107 S.Ct. at 1037 (Stevens, J.). He concluded that Asahi's conduct did rise to the level of "purposeful availment" in the state of California

because of the large number of Asahi's units that ended up there. *Id.*

■ Our reading of *World–Wide Volkswagen* and *Asahi* is that the Supreme Court has not abandoned the *International Shoe* two-pronged test as further articulated in *Hanson* and *Burger King.* The touchstone of the minimum contacts analysis remains that an out-of-state person have engaged in some activity purposefully directed toward the forum state. *See Hanson,* 357 U.S. at 253, 78 S.Ct. at 1239; *Burger King,* 471 U.S. at 475, 105 S.Ct. at 2183; *World–Wide Volkswagen,* 444 U.S. at 297, 100 S.Ct. at 567. And if that initial test is met, a court must still determine whether the exercise of such jurisdiction would offend traditional notions of fair play and substantial justice. See *Asahi,* 480 U.S. at 113, 107 S.Ct. at 1032–33. This reading of *World–Wide Volkswagen* and *Asahi* has prior support in our jurisprudence. *See Ellicott Mach. Corp. v. John Holland Party, Ltd.,* 995 F.2d 474, 477 (4th Cir.1993) (holding that minimum contacts exist where the defendant "purposefully directs its activities toward the residents of the forum"); *see also Federal Insurance Co. v. Lake Shore, Inc.,* 886 F.2d 654 (4th Cir.1989).[1] To permit a state to assert jurisdiction over any person in the country whose product is sold in the state simply because a person must expect that to happen destroys the notion of individual sovereignties inherent in our system of federalism. Such a rule would subject defendants to judgment in locations based on the activity of third persons and not the deliberate conduct of the defendant, making it impossible for defendants to plan and structure their business contacts and risks. Moreover, we do not believe that the holding of *World–Wide Volkswagen* takes us as far as plaintiff in this case suggests. Thus, we hold that the test to be applied in considering the reach of personal jurisdiction inquires whether (1) the defendant has created a substantial connection to the forum state by action purposefully directed toward the forum state or otherwise

---

**1.** Other circuits have split on the question of whether the "stream of commerce" language in *World–Wide Volkswagen* should control. *See Boit v. Gar–Tec Products, Inc.,* 967 F.2d 671 (1st Cir.1992) (adopting Justice O'Connor's position); *Falkirk Mining Co. v. Japan Steel Works, Ltd.,* 906

F.2d 369 (8th Cir.1990) (same); *Dehmlow v. Austin Fireworks,* 963 F.2d 941 (7th Cir.1992) (adopting Justice Brennan's position); *Irving v. Owens–Corning Fiberglas Corp.,* 864 F.2d 383 (5th Cir.) (same), *cert. denied,* 493 U.S. 823, 110 S.Ct. 83, 107 L.Ed.2d 49 (1989).

invoking the benefits and protections of the laws of the state; and (2) the exercise of jurisdiction based on those minimum contacts would not offend traditional notions of fair play and substantial justice, taking into account such factors as (a) the burden on the defendant, (b) the interests of the forum state, (c) the plaintiff's interest in obtaining relief, (d) the efficient resolution of controversies as between states, and (e) the shared interests of the several states in furthering fundamental substantive social policies. *See Hanson*, 357 U.S. at 253, 78 S.Ct. at 1239; *Burger King*, 471 U.S. at 475, 105 S.Ct. at 2183; *Asahi*, 480 U.S. at 113, 107 S.Ct. at 1033.

With this test now at hand, we turn to the facts of this case to determine whether Maryland can constitutionally assert personal jurisdiction over Hollingsworth & Vose.

### III

■ Hollingsworth & Vose is a Massachusetts corporation with its principal place of business in Massachusetts. It has demonstrated that it had no presence in Maryland by having any office, agent, or employee there, and it had no customers in Maryland. It was not registered to do business there and directed no marketing effort or other activities toward the state. It acknowledges, however, that less than one percent of its income has derived from Maryland through Lorillard's sale of cigarettes there. Hollingsworth & Vose entered into a filter supply arrangement with Lorillard under which Hollingsworth & Vose shipped filter material to Lorillard's plants in Kentucky and New Jersey. It acknowledges that, to the extent that it sold filter material to Lorillard in Kentucky and New Jersey, it placed the product in commerce, and it did so with knowledge that Kent cigarettes manufactured with its filter material would be sold in Maryland.

Lesnick relies principally upon the language in *World–Wide Volkswagen* that a state does not violate the Due Process Clause if it asserts personal jurisdiction over a corporation "that delivers its products into the stream of commerce with the expectation that they will be purchased in the forum State." 444 U.S. at 298, 100 S.Ct. at 567. Hollingsworth & Vose concedes that if this language fully states the jurisdictional test, it is subject to personal jurisdiction in Maryland. As we have already concluded, however, *World–Wide Volkswagen*'s holding is not so broad as Lesnick would have us believe, and the long-standing principles of personal jurisdiction that began with *International Shoe* have not been overruled. Thus, Lesnick cannot rely simply upon the "stream of commerce" logic to establish jurisdiction.

Lesnick falls back on the contention that because Hollingsworth & Vose had such a close relationship with Lorillard, Hollingsworth & Vose would be subject to jurisdiction derivatively through Lorillard's contacts. In support of her contention, Lesnick relies upon the close cooperation that existed between the two defendants by reason of the contract entered into in 1952. Under that agreement, the two jointly owned the patent to the "Micronite Filter" and agreed to share information about technical advances in the field. The two also shared equally the costs of developing the filter, including the costs of creating manufacturing facilities, and they agreed to share any royalties they might earn from licensing the process. In addition, the price Lorillard paid for the filters was a multiple of Hollingsworth & Vose's cost, with Lorillard given a right to inspect production and financial records. Hollingsworth & Vose agreed to sell filter material for tobacco use only to Lorillard for at least the first five years of their dealings. Finally, Lorillard agreed to indemnify Hollingsworth & Vose for any liabilities arising from the harmful effects of the product. The record shows that the two companies exercised some measure of cooperation during the course of the agreement to ensure that the filter was successful.

Although this arrangement represents "additional conduct" beyond the mere sale to Lorillard of filter material,[2] it does not rise to

---

2. Lesnick does not contend that Lorillard and Hollingsworth & Vose engaged in a joint venture as defined by Maryland law. We understand, rather, that her allegation rests on the notion that the closeness of the corporations' activities

the level of establishing jurisdiction because none of the conduct is in any way directed *toward the state of Maryland.* All of the listed contacts between Lorillard and Hollingsworth & Vose relate only to Hollingsworth & Vose's agreement to supply filters from its plant in Massachusetts to Lorillard in Kentucky and New Jersey. While the result might be different if Hollingsworth & Vose had changed production to comply with Maryland regulations or if it had set up a customer relations network there, *see Asahi,* 480 U.S. at 112, 107 S.Ct. at 1032 (O'Connor, J.), on the record in this case, we can discover no affirmative action by Hollingsworth & Vose rising to the level of purposeful availment. Therefore, the Maryland courts may not exercise personal jurisdiction over Hollingsworth & Vose in this case, and the judgment of the district court is affirmed.

*AFFIRMED.*

created a *de facto* agency for jurisdictional purposes.