**Michael ESTES, Plaintiff,**

v.

**MIDWEST PRODUCTS, INC., Defendant.**

No. CIV. A. 5:98–0239.

United States District Court,
S.D. West Virginia,
Beckley Division.

Nov. 4, 1998.

---

622

John D. Wooton, Beckley, WV, for Plantiff.

Scott A. Damron, Huntington, WV, for Defendant.

## MEMORANDUM OPINION AND ORDER

GOODWIN, District Judge.

The parties are in agreement as to the essential facts. A West Virginia resident and citizen, Michael Estes, purchased from a West Virginia Kmart or Wal–Mart an air tank manufactured by Midwest Products, Inc. (Midwest) in Missouri. Shortly thereafter, as a service station attendant attempted to fill it, the tank apparently exploded, seriously injuring Mr. Estes. On March 18, 1998, Mr. Estes filed this products liability action. He contends that Midwest was negligent in the design, manufacture, and sale of the air tank. He further alleges that the product was defective and that Midwest breached numerous warranties. In response, Midwest filed a motion to dismiss for lack of personal jurisdiction pursuant to *Federal Rules of Civil Procedure*, Rule 12(b)(2). Ancillary to the question of personal jurisdiction is the issue of insufficiency of service of process.

Although its manufacturing operations are based in Missouri, Midwest has structured its primary conduct so that its finished products will be purposefully and intentionally sold in the state of West Virginia. Its purpose and intent is revealed in the distribution scheme it has undertaken. Midwest does not merely relinquish its products into the stream of commerce. Rather, by selling it products to consumers in this state through national retailers, Midwest manifests its purpose and intent to sell its air tanks here.

The Court **FINDS** that Midwest has purposefully availed itself of the benefits and protections of doing business in the state of West Virginia and has established minimum contacts with the state such that jurisdiction may be asserted without offending traditional notions of fair play and substantial justice. For reasons explained more fully below, the defendant's motion is **DENIED**.

### I.

The party seeking to invoke the jurisdiction of the Court bears the burden of proving that jurisdiction is proper. *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 59–60 (4th Cir.1993). The issue is heavily dependant upon case-by-case factual determinations. *See Gray v. American Radiator & Standard Sanitary Corp.*, 22 Ill.2d 432, 176 N.E.2d 761, 767 (Ill.1961). The party bearing the burden must prove by a preponderance of the evidence facts upon which jurisdiction is based. *Mylan Labs.*, 2 F.3d at 59–60; *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir.1989). However, for purposes of determining whether the plaintiff has established a prima facie case of jurisdiction to survive a motion to dismiss, the Court construes allegations in a light most favorable to the plaintiff thereby drawing the most favorable inferences for the existence of jurisdiction. *Mylan Labs.*, 2 F.3d at 60; *Combs*, 886 F.2d at 676.

### II.

Midwest is a Missouri corporation that manufactures pressurized air tanks for various uses. Its sole place of business is located in Strafford, Missouri. Midwest has no salesmen who visit West Virginia, no contracts for the sale of its products directly to West Virginia residents or businesses, no transportation fleet that might cross into the state, and no direct advertising that might reach West Virginia residents. Additionally, none of its contracts are negotiated or executed in West Virginia. In fact, by affidavit of its Executive Vice President and Chief Financial Officer, Tom Coleman, Midwest claims that it "does not send any employees into the state for any reason."

Midwest's products are sold in West Virginia, however. Indeed, Midwest admits that it directs its products to "the national market," a market which undeniably includes West Virginia. Midwest generates seventeen million dollars in annual sales by selling its products in bulk to large national retail chains such as Wal–Mart, Target, Auto Zone, and Kmart. These retail chains in turn sell to residents of the states they serve through individual stores within those states. Contracts between Midwest and the retail chains are made at the corporate level either at Midwest's Missouri office or at the retail chains' corporate offices. By common carrier, Midwest delivers products to the purchasers' distribution centers where the products are warehoused for shipment directly to the purchasers' individual retail stores.

### III.

■ The prerequisites for asserting personal jurisdiction are well-established in the Fourth Circuit. First, the Court must inquire whether the long-arm statute applicable in the forum state authorizes the exercise of jurisdiction over the defendant. *ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 622 (4th Cir.1997); *In re Celotex Corp.; Owens–Illinois, Inc. v. Rapid American Corp.*, 124 F.3d 619, 627 (4th Cir.1997). If it does, the Court must further decide whether the Court's exercise of jurisdiction comports with constitutional guarantees of due process. *ESAB Group*, 126 F.3d at 622; *Celotex*, 124 F.3d at 627. West Virginia's long-arm statute is coextensive with the full reach of due process; thus, the statutory step is merged into the constitutional analysis. *Celotex*, 124 F.3d at 627–28. Accordingly, the sole issue before the Court is whether exercising personal jurisdiction over Midwest is consistent with the Due Process Clause of the United States Constitution.[1]

### IV.

A Court may render judgment consistent with the Due Process Clause only with respect to those persons over which it has personal jurisdiction. *Omni Capital Int'l v. Rudolf Wolff & Co.*, 484 U.S. 97, 103–04, 108 S.Ct. 404, 98 L.Ed.2d 415 (1987). Historically, personal jurisdiction was tied directly to presence. *See Pennoyer v. Neff*, 95 U.S. 714, 720, 24 L.Ed. 565 (1877) (denying personal jurisdiction "where a defendant does not appear in the court, and is not found within the state, and is not a resident thereof"); *Lesnick v. Hollingsworth & Vose Co.*, 35 F.3d 939, 941 (4th Cir.1994) (proposing that while the "immediate concept of 'presence' is no longer part of the language ... the establishment of a surrogate for presence has been the core task in defining the due process boundaries of a state's legitimate exercise of sovereignty over a person beyond its borders"). An individual defendant could be haled into the court of a given state to defend himself only if he could be found within the state. *Pennoyer*, 95 U.S. at 731.

Although well-articulated, the presence rule was clumsy when applied to corporate defendants. The corporate entity itself is a legal fiction having no corporeality. The corporation may not act on its own, but only through agents. *St. Clair v. Cox*, 106 U.S. 350, 353, 1 S.Ct. 354, 27 L.Ed. 222 (1882). A corporation's "presence" is therefore difficult to determine. *See McGee v. International Life Ins. Co.*, 355 U.S. 220, 222, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957) ("[J]ust where this line of limitation falls has been the subject of prolific controversy, particularly with respect to foreign corporations.")

It is surely agreed that the corporation "exists" at least in the state wherein it is incorporated. Noteworthy decisions rendered in the early years of constitutional jurisprudence limited the concept of corporate presence to the state of incorporation— the corporation was considered incapable of migrating to another sovereignty and no mode existed to compel appearances in other states. *See Peckham v. North Parish*, 33 Mass. 274, 16 Pick. 274, 285–86 (Mass.1834) ("[W]e hold that all foreign corporations are without the jurisdiction of the process of the courts of this Commonwealth."); *McQueen v.*

---

1. The insufficiency of service of process argument is wholly dependant upon the Court's alleged lack of jurisdiction. Because the Court finds that it has jurisdiction over Midwest, it will not reach the failure of process allegation.

*Middletown Mfg. Co.,* 16 Johns. 5, 6–7 (N.Y.Sup.Ct.1819) ("[A] foreign corporation never could be served here."). The result for the plaintiffs, in many cases, was injustice and inconvenience. *St. Clair,* 106 U.S. at 355, 1 S.Ct. 354. Corporations clearly benefitting from doing business in a state were held not present in the state and thus not amenable to suit there even when activities purposefully and directly affecting citizens in the state caused injury there. At that time in this nation's history, "business affairs were predominately local in nature and travel between States was difficult, costly and sometimes even dangerous." *Hanson v. Denckla,* 357 U.S. 235, 260, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958) (Black, J., dissenting).

As the twentieth century began, corporations proliferated and enjoyed marked success. Improvements in transportation and communications, coupled with better integrated economies and markets, changed the way American corporations did business and subsequently lessened the burdens of submitting to litigation in foreign jurisdictions. *Id.* (Black, J., dissenting) ("In the course of this evolution the old jurisdictional landmarks have been left far behind so that in many instances States may now properly exercise jurisdiction over nonresidents not amenable to service within their borders.") With the emergence of the fledgling national economy, jurists began to relax the strict requirements, referring to a corporation as present in a certain jurisdiction when those who were vested with authority to act on behalf of the corporation were present there. *St. Clair,* 106 U.S. at 355, 1 S.Ct. 354.

Against this background, the seminal case of *International Shoe* was decided. *See International Shoe v. Washington,* 326 U.S. 310, 319, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (finding that the test cannot be mechanical or quantitative but must "depend rather upon the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure"). In *International Shoe,* the Court more acutely defined the activities within a state that would render a corporation amenable to suit therein. Seizing on the *St. Clair* Court's shift

from a rigorous presence test to a more fact-driven agency test, the *International Shoe* Court determined that a defendant constitutionally may be haled into the forum state if the defendant first established sufficient contact with the forum. The Court held that "due process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Id.* at 316, 66 S.Ct. 154 (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940)). The Court explained:

> to the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protections of the laws of that state. The exercise of that privilege may give rise to obligations; and, so far as those obligations arise out of or are connected with the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue.

*Id.* at 319, 326 U.S. 310.

Like many businesses during its time, the International Shoe Company used a network of traveling salesmen to peddle its wares in the forum state. *Id.* at 313, 66 S.Ct. 154. It had no office in the forum state, made no contracts there, and maintained no stock of merchandise in the forum. *Id.* Rather, the company supplied its dozen salesmen with a line of samples, each consisting of one shoe of a pair, which the salesmen displayed to potential customers. *Id.* at 313–14, 66 S.Ct. 154. The Court found that these activities, being systematic and continuous and resulting in a large volume of business, were sufficient to satisfy due process concerns. *Id.* at 320, 66 S.Ct. 154.

If there were any questions as to whether the rule in *International Shoe* drew from the increasing pervasiveness of corporations and interdependence of state economies, they were put to rest in *McGee.* The *McGee* Court, after examining *International Shoe,* squarely placed the rule in its proper setting:

Looking back over this long history of litigation a trend is clearly discernible toward expanding the permissible scope of state jurisdiction over foreign corporations and other nonresidents. In part this is attributable to the fundamental transformation of our national economy over the years. Today many commercial transactions touch two or more States and may involve parties separated by the full continent. With this increasing nationalization of commerce has come a great increase in the amount of business conducted by mail across state lines. At the same time modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity.

*Id.* at 222–23, 66 S.Ct. 154.

The *International Shoe* Court focused the law of personal jurisdiction squarely on the nature and quality of the contacts between the defendant and the forum. The resulting test is wholly dependant on the facts of the individual case. *Perkins v. Benguet Consol. Min. Co.,* 342 U.S. 437, 445, 72 S.Ct. 413, 96 L.Ed. 485 (1952).

In the years since *International Shoe,* the Court has repeatedly returned to its familiar theme of linking due process concerns with the continuing integration of the national economy. In *Hanson v. Denckla,* 357 U.S. 235, 251, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958), the Court recognized that while the rapidly integrating economy prompted expansion of the states' jurisdictional reach, the phenomenon did not force the end of jurisdictional limits. Some action by the defendant that invoked the benefits and protections of the law of the forum was necessary. *Id.* at 253. The Court instructed that the "unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State." *Id.* The Court acknowledged that the "application of that rule will vary with the quality and nature of the defendant's activity," but held that "it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Id.*

In 1961, three years after *Hanson,* the Illinois Supreme Court decided *Gray v. American Radiator & Standard Sanitary Corp.,* 22 Ill.2d 432, 176 N.E.2d 761, 766–67 (Ill.1961). In *Gray,* as in this case, the plaintiff sought to hold an out-of-state manufacturing company liable for injuries sustained as a result of an alleged product defect. The defendant claimed not to have any contacts with the forum state except that the component product it manufactured was later incorporated into a hot water heater by a third party that was eventually sold into the forum state. The Illinois court held that the defendant's actions resulted in substantial use and consumption in the forum state; and therefore, the corporation enjoyed benefits stemming indirectly from the protections afforded by the forum state's laws. "Where the alleged liability arises, as in this case, from the manufacture of products presumably sold in contemplation of use here, it should not matter that the purchase was made from an independent middleman or that someone other than the defendant shipped the product into this State." *Id.* at 766. Based entirely upon the defendant's "contemplation of use" in the forum, the Illinois court found that personal jurisdiction existed in the courts of the forum state.

In *World–Wide Volkswagen,* the plaintiffs, a married couple who purchased a new automobile in New York and who were shortly thereafter involved in a serious accident in Oklahoma, brought suit in Oklahoma against the New York auto dealer and distributor. The plaintiffs acknowledged that the defendants were not actually present in Oklahoma, but argued that the use of the automobile in Oklahoma was foreseeable to the defendants. Teetering on foreseeability alone, the plaintiffs constructed an argument that the defendants indirectly benefitted from the laws and protections of the state of Oklahoma and could therefore be forced to defend themselves against suit there. The Supreme Court rejected the argument because the defendants had no contacts with Oklahoma. *World–Wide Volkswagen,* 444 U.S. at 288, 291, 100 S.Ct. 559.

The Supreme Court then endorsed the *Gray* contemplation of use findings:

When a corporation "purposefully avails itself of the privilege of conducting activities within the forum State," *Hanson v. Denckla,* 357 U.S., at 253, 78 S.Ct., at 1240, it has clear notice that it is subject to suit there, and can act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the State. Hence if the sale of a product of a manufacturer or distributor such as Audi or Volkswagen is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others. The forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State. *Cf. Gray v. American Radiator & Standard Sanitary Corp.,* 22 Ill.2d 432, 176 N.E.2d 761 (1961).

*Id.* at 297–98, 100 S.Ct. 559.

The Supreme Court returned to the stream-of-commerce analogy in *Asahi Metal Industry Co. v. Superior Court of California,* 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987), "in an attempt to throw additional light on *World–Wide Volkswagen*'s language that a mere placement of goods 'in the stream of commerce' subjects a plaintiff to suit in any state where the goods might

foreseeably cause injury." *Lesnick,* 35 F.3d at 944.

In a badly splintered opinion,[2] the United States Supreme Court held that the California courts did not have personal jurisdiction over Asahi, a Japanese component parts manufacturer, because assertion of jurisdiction under those circumstances would "offend traditional notions of fair play and substantial justice" in violation of the second prong of the *International Shoe* test. The Court did not reach a majority opinion on the question of whether Asahi maintained "minimum contacts" with the forum state sufficient to satisfy *International Shoe*'s first prong. The precise issue of contention was the factual circumstances under which the *World–Wide Volkswagen* stream-of-commerce test would provide jurisdiction.

In *Asahi,* Justice Brennan argued that placement of a product in a stream of commerce with the expectation of delivery into the forum state should be enough to show such an intent and purpose.

The stream of commerce refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacture to distribution to retail sale. As long as a participant in this process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise. Nor will the litigation present a burden for which there is no corresponding benefit. A defendant who has placed goods in the stream of commerce benefits economically from the retail sale of the final product in the forum State, and indirectly benefits from the State's laws that regulate and facilitate commercial activity.

**2.** Justice O'Connor, joined by Chief Justice Rehnquist and Justices Powell and Scalia, opined that the exercise of personal jurisdiction cannot be based on the defendant's mere act of placing its product in the stream of commerce with the expectation that the products might eventually be sold in the forum. *Asahi,* 480 U.S. at 112, 107 S.Ct. 1026 (O'Connor, J.). Justice Brennan, joined by Justices White, Marshall, and Blackmun, concurred in the judgment, but determined that jurisdiction may be properly based upon the placement of products in the stream of commerce with the expectation that the products

would be sold in the forum. *Id.* at 120, 107 S.Ct. 1026 (Brennan, J.). Justice Stevens, joined by Justices White and Blackmun, would not have reached the first prong of the *International Shoe* test, but instead would only have found the exercise of jurisdiction over Asahi to be offensive to traditional notions of fair play and substantial justice. *Id.* at 121–22, 107 S.Ct. 1026 (Stevens., J.). Nevertheless, Justice Stevens argued that the concept of purposeful availment is affected by the "volume, the value, and the hazardous character of the components." *Id.* at 122, 107 S.Ct. 1026 (Stevens., J.).

*Id.* at 117, 107 S.Ct. 1026 (Brennan, J.). That is, Justice Brennan reasoned that placement of goods in the stream of commerce with the expectation that they will arrive in the forum state is sufficient to satisfy due process concerns. The stream of commerce, to Justice Brennan, was akin to a certain delivery system, so placement with expectation necessarily revealed intent and purpose.

Justice O'Connor refused to hold that placement with expectation is sufficient in all cases. Justice O'Connor also required only an intent and purpose on behalf of the defendant to reach the forum state, but she saw the stream of commerce to be much less certain than did Justice Brennan. Mere placement of products into the stream of commerce with expectation of arrival in the forum state was not enough to her because placement, in Justice O'Connor's opinion, was akin to relinquishment of the goods to a third party. Relinquishment of goods, even with the expectation of arrival in the forum state, cannot in all cases reveal a purpose and intent to reach the forum state. *See generally World–Wide Volkswagen,* 444 U.S. 286, 100 S.Ct. 559. Justice O'Connor, therefore, required more; and she provided examples of other activity by the defendant that would have satisfied her that the placement of goods in the stream of commerce was done with the purpose and intent that the goods reach the forum state.

> The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State. But a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream

into an act purposefully directed toward the forum State.

*Id.* (O'Connor, J.).

At base, the Justices in *Asahi* unanimously agreed that the defendant must have the purpose and intent to reach the forum state in order for a court to assert jurisdiction over him. The added activity required by Justice O'Connor merely reveals that purpose and intent whereas Justice Brennan found the intent in the expectation of delivery and Justice Stevens found the intent in the volume and continuity of delivery.

## V.

A review of the personal jurisdiction cases decided by the Fourth Circuit Court of Appeals reveals a similar conceptual development. Although the Fourth Circuit had adopted Justice Brennan's view of the stream of commerce prior to *Asahi,* no Fourth Circuit opinion after *Asahi* has found jurisdiction to exist based simply on a stream-of-commerce theory. In fact, some have even questioned whether the stream of commerce still flows through the Fourth Circuit. *See generally* Lori Elizabeth Jones, Lesnick v. Hollingsworth & Vose Co.—*The Pure Stream of Commerce No Longer Flows Through the Fourth Circuit,* 29 U. RICH. L. REV. 421 (1995). The change in the Fourth Circuit's treatment of the stream analogy appears to hinge on the conceptual differences evident in Justice O'Connor's and Justice Brennan's opinions in *Asahi* and also on the facts of the cases the circuit has had before it.

Prior to *Asahi,* in *Blue Ridge Bank v. Veribanc, Inc.,* 755 F.2d 371 (4th Cir.1985), the Fourth Circuit held a Massachusetts corporation subject to jurisdiction in Virginia based upon the stream-of-commerce theory. Blue Ridge had sued Veribanc for defamation stemming from an unfavorable analysis of Blue Ridge which Veribanc had prepared and later sold to the Chicago Tribune Syndicate for publication in the *Richmond Times–Dispatch.* In reviewing the due process implications of asserting jurisdiction over Veribanc, the Fourth Circuit explicitly endorsed the view that jurisdiction exists over a corporation that "delivers its products into the

stream of commerce with the expectation that they will be purchased by consumers in the forum state." *Blue Ridge,* 755 F.2d at 374 (quoting *World–Wide Volkswagen,* 444 U.S. at 297–98, 100 S.Ct. 559). The court found that Veribanc had conditioned the sale of its analysis on the inclusion of its name, city, and state in any publication of the material. The court predicated jurisdiction on the fact that Veribanc "obviously knew that [the purchaser] was going to write an article that included the allegedly libelous information about Blue Ridge and that the article could find its way into the Commonwealth of Virginia." *Id.*[3]

In its more recent opinions, the Fourth Circuit has required a greater indicia of purpose and intent to serve the forum state than mere placement in the stream of commerce coupled with an expectation of arrival in the forum. The shift can be traced to *Chung v. NANA Development Corp.,* 783 F.2d 1124 (4th Cir.1986). In *Chung,* the Virginia plaintiff sued the Alaska defendant for losses incurred when an order of 380 pounds of frozen reindeer antlers thawed during shipment. The only contact between the defendant and the state of Virginia was the single delivery to Virginia that was the subject of the suit. The court again endorsed the stream of commerce language of *World–Wide Volkswagen* but qualified it by arguing that "[u]nique or insignificant relations with the forum suggest an absence of purposefulness, leading to the conclusion that subjecting the defendant to personal jurisdiction would be fundamentally unfair." *Id.* at 1127. The court concluded that the defendant had "simply not sent its goods into the stream of interstate commerce with the minimal regularity due process demands." *Id.* at 1129. Thus, the defendant's activities showed "no actual or desired connection with Virginia, the forum state." *Id. Chung* required more than mere placement of goods in the stream of commerce with the expectation that they enter the forum state—for predictability and fair notice, *Chung* required significant vol-

ume, which the court couched in the phrase "purposeful availment." *Chung,* 783 F.2d at 1127–29.

In its first mention of the stream of commerce after *Asahi,* the Fourth Circuit in *Federal Insurance Co. v. Lake Shore Inc.,* 886 F.2d 654, 657 (4th Cir.1989) determined that jurisdiction could not be asserted over a Michigan manufacturer of component parts merely because the ultimate consumer of the finished product unilaterally brought the finished product into the forum state. The plaintiff contended that the defendant was subject to jurisdiction because it placed defective products in the stream of commerce that allegedly caused injury in the forum state. *Id.* at 658. The court rejected the argument out of hand, stating that the stream-of-commerce theory cannot supplant the requirement of purpose and intent to reach the forum. *Id.*. The defective product did not reach the forum state through the stream of commerce; thus, the court found the theory inapplicable to the facts. *Id.* at 659.

On the limited facts of *Federal Insurance,* the Fourth Circuit panel declined to accept *Asahi* 's implicit invitation to choose between the stream-of-commerce theories of Justices O'Connor and Brennan. The invitation was accepted in *Lesnick,* 35 F.3d at 945–46.

In *Lesnick,* the widow of a deceased cigarette smoker filed a Maryland suit against a cigarette manufacturer and the Massachusetts manufacturer of asbestos-laden material that the cigarette manufacturer had incorporated into the cigarettes's filters. The Massachusetts corporation, Hollingsworth & Vose, filed a motion to dismiss the suit for lack of personal jurisdiction. It argued that Justice O'Connor's reasoning in *Asahi* disallowed jurisdiction to be asserted over an out-of-state manufacturer based solely on the stream-of-commerce theory. *Id.* at 940–41. The corporation stressed that its only connection with the forum was its knowledge that its component products would eventually

---

**3.** The Fourth Circuit also endorsed the placement with expectation view in *August v. HBA Life Insurance Co.,* 734 F.2d 168, 173 (4th Cir.1984). However, in *August,* the court failed to find jurisdiction, like the Supreme Court in *World–Wide*

*Volkswagen,* because no stream of commerce existed—contacts with the forum state were wholly the result of the unilateral movement of the end-consumer. *Id.*

be incorporated into products that would eventually reach the forum state. *Id.*

The plaintiff argued first that the expansive stream-of-commerce language of *World–Wide Volkswagen*, which appeared to require only that the defendant place a product in the stream of commerce with the expectation that it will be purchased in the forum state, should control. *Id.* at 941. Alternatively, the plaintiff argued that even if *Asahi* were read to limit *World–Wide Volkswagen*, jurisdiction would still be proper because Hollingsworth & Vose was "no mere supplier of component parts," but was instead purposefully availing itself of the privilege of conducting business, through the cigarette manufacturer's sales, throughout the entire United States. *Id.* (quotation omitted).

The district court granted the motion to dismiss, finding that "Hollingsworth & Vose Company [was] not engaged directly, as is Lorillard, in bringing the alleged offending product into Maryland, or doing anything with respect to Maryland, other than supplying its product to defendant Lorillard in a state other than Maryland." *See id.* (quotation omitted). The plaintiff appealed, and a Fourth Circuit panel affirmed.

The *Lesnick* court began its analysis with a historical review of the law of personal jurisdiction, which it summarized by concluding that the proper assertion of jurisdiction in a particular case is wholly dependant upon the facts and circumstances of the individual case including the relevant economic realities. *Id.* at 943.

The court examined *World–Wide Volkswagen* and *Asahi* at length. In light of the facts therein, the court read *World–Wide Volkswagen* to require "purposeful activity on the part of the defendants to establish meaningful contact with the forum state." *Id.* at 944. The court read *Asahi* similarly, finding that neither *Asahi* nor *World–Wide Volkswagen* had abandoned the minimum contacts test of *International Shoe. Id.* at 944–45. The court therefore determined that "[t]he touchstone of the minimum contacts analysis remains that an out-of-state person have engaged in some activity purposefully directed toward the forum state." *Id.* at 945.

Borrowing from its earlier concern about predictability and notice in *Chung,* the court reasoned that

> To permit a state to assert jurisdiction over any person in the country whose product is sold in the state simply because a person must expect that to happen destroys the notion of individual sovereignties inherent in our system of federalism. Such a rule would subject defendants to judgment in locations based on the activity of third persons and not the deliberate conduct of the defendant, making it impossible for defendants to plan and structure their business contacts and risks.

*Id.* at 945; *see also Chung,* 783 F.2d at 1127 (finding that due process requires fair notice, which provides a degree of predictability that allows defendants to avoid liability in certain jurisdictions if desired).

Finally, the *Lesnick* court announced that

> [T]he test to be applied in considering the reach of personal jurisdiction inquires whether (1) the defendant has created a substantial connection to the forum state by action purposefully directed toward the forum state or otherwise invoking the benefits and protections of the laws of the state; and (2) the exercise of jurisdiction based on those minimum contacts would not offend traditional notions of fair play and substantial justice, taking into account such factors as (a) the burden on the defendant, (b) the interests of the forum state, (c) the plaintiff's interest in obtaining relief, (d) the efficient resolution of controversies as between states, and (e) the shared interests of the several states in furthering fundamental substantive social policies.

*Lesnick,* 35 F.3d at 945–46.

Turning to the facts of the case before it, the Fourth Circuit panel noted that Hollingsworth & Vose had no actual presence in Maryland and had no customers in the state. The company was not registered to do business in Maryland, nor did it direct any marketing efforts or other activities toward the state. Furthermore, although some of its products did eventually reach the state of Maryland as components of Lorillard's ciga-

rettes, those sales amounted to less than one percent of its income. The court concluded, therefore, that the plaintiff could not "rely simply upon the 'stream of commerce' logic to establish jurisdiction." *Id.* at 946.[4]

## VI.

It is appropriate that this Court apply the personal jurisdiction test articulated in *Lesnick* to the facts of this case. First, the Court must determine whether "the defendant has created a substantial connection to the forum state by action purposefully directed toward the forum state or otherwise invoking the benefits and protections of the laws of the state." *Lesnick,* 35 F.3d at 945–46.

Midwest argues that *Lesnick,* coupled with *World–Wide Volkswagen,* requires the Court to dismiss this case. First, *World–Wide Volkswagen* is not even a stream-of-commerce case. The defendants were not present in the forum state of Oklahoma, nor did they use a sales or distribution scheme whereby their finished products would reach Oklahoma as products for sale. The chain of events leading to the product's arrival in the forum were not commercial in nature. Rather, the product's arrival in the forum was entirely due to the unilateral activity of the consumers. The stream of commerce was not implicated.

As to *Lesnick,* the defendant in that case was a component part manufacturer. That manufacturer was not present in the state in which the finished product ultimately was purchased and allegedly caused injury, nor did the component part manufacturer have sufficient contacts with the forum to substitute for presence in the state. Although it may have foreseen and even expected that its components would eventually wind up in the forum state as part of a finished product, the defendant did not purposefully direct its activities toward the forum state. It "relinquished" its product into the stream of commerce, wherein a third party made it a part of a separate finished product—a cigarette. The cigarette ended up in the forum state. Thus, the defendant did not have "clear notice that it [would be] subject to suit there, and [could not] act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks [were] too great, severing its connection with the state." *Lesnick,* 35 F.3d at 944.

■ By contrast, Midwest manufactures *finished* products which it directs to the "national market" directly through its sales to national retailers Kmart, Wal–Mart, and others. The defendant's intent and purpose are completely revealed in its decision to sell through national retail chains. The defendant does not merely relinquish its products into the stream of commerce without care for whatever path those products take thereafter. Rather, it is the direct purpose and intent of the defendant that its products be sold in Kmart and Wal–Mart stores in West Virginia. The defendant's purpose and intent does not wash away in the stream as its products are placed therein. Rather, the defendant structures its primary conduct with genuine assurance that its activities will render them liable to suit in West Virginia. It is the difference between shipment and setting adrift. It cannot, therefore, be said to be unfair to hale the defendant into the courts of West Virginia to respond to suit arising from injuries its purposeful conduct has allegedly created.

The stream-of-commerce analysis is necessarily altered in the case of a manufacturer

---

4. Fourth Circuit panels have mentioned the stream of commerce theory in but one published and two unpublished cases since *Lesnick. See Celotex Corp.,* 124 F.3d at 629 (summarizing *Lesnick,* but concluding that the plaintiff's complaint failed to meet the Rule 8(a) requirement of alleging activity purposefully directed at the forum); *Gray v. Riso Kagaku Corp.,* 82 F.3d 410, *available in* 1996 WL 181488, at *3 (4th Cir. Apr.17, 1996) (per curiam) (citing *Lesnick,* 35 F.3d at 944); *Autoscribe Corp. v. Goldman,* 47 F.3d 1164, 1995 WL 56662, at *6 (4th Cir. Feb.3, 1995) (per curiam) ("It is not clear that this Court would as readily adopt a stream of commerce theory."); *see also St. Jarre v. Druckmaschinen,* 19 F.3d 1430, 1994 WL 95944, at *3 (4th Cir. Mar.25, 1994) (per curiam) (finding, pre-*Lesnick,* that the mere placement into the stream of products by a defendant is not an act "purposefully directed" at the forum). In none of the cases did the court find jurisdiction appropriately based upon the theory. Nor did the opinions in any of the cases offer an analysis of the stream-of-commerce theory.

of a finished product. This distinction has prior support in the Fourth Circuit. In *Abel v. Montgomery Ward Co. Inc.*, 798 F.Supp. 322, 326 (E.D.Va.1992), the court distinguished its facts from *Federal Insurance v. Lake Shore Inc.*, 886 F.2d 654 (4th Cir.1989), on the same basis. The defendant in *Abel* was a manufacturer of finished bicycles who marketed its products through a national retailer. As in this case, the *Abel* court distinguished *Federal Insurance* because *Abel* involved a "course of activity which is akin to '... marketing the product through a distributor who has agreed to serve as the sales agent in the forum State' as opposed to an isolated instance where a single product or component was brought into the forum by the consumer or third party." *Abel*, 798 F.Supp. at 326 (citation and footnote omitted).

The importance of the distinction is seen when one considers the ability of Midwest to structure its conduct so as to limit the geographic scope of its liability. Whereas, a component manufacturer typically has very little opportunity to dictate where its customers might direct its products and act contractually to limit its liabilities there, the manufacturer of finished goods can often act to confine its liability to a limited geographic area.

For example, Midwest itself sells nearly half of its portable air tanks through two retailers: Wal–Mart and Kmart. Midwest's relationship with the two retailers is governed by vendor agreements. Were Midwest wary of defending itself against lawsuits in West Virginia, it would not be inconceivable that Midwest would restrict the retailers' freedom to sell Midwest's products in the state. *See Rossman v. State Farm Mut. Auto. Ins. Corp.*, 832 F.2d 282, 287 (4th Cir.1987) (finding insurance company susceptible to jurisdiction in Virginia based on insurance policy covering entire United States). Such a provision might come at a

substantial price to Midwest's profit, but exposure to liability is often the price of commerce. *See id.* ("If Consolidated wished to avoid suit in Virginia ..., it could have excluded that state from the 'policy territory' defined in the policy. Consolidated is well aware that such a limitation would make its policy less marketable.") In this vein, the Court notes that both Kmart and Wal–Mart have taken similar tacks by inserting into their vendor agreements a provision that requires Midwest both to carry insurance and to indemnify them from and against any and all claims arising out of any injury to any person claimed to result from alleged defect in Midwest's products.[5]

Of less interest to the parties, but still relevant to the assertion of personal jurisdiction is the second prong of the *Lesnick* personal jurisdiction test. Here, the Court must determine whether the exercise of jurisdiction would offend traditional notions of fair play and substantial justice. In so doing, the Court must consider "(a) the burden on the defendant, (b) the interests of the forum state, (c) the plaintiff's interest in obtaining relief, (d) the efficient resolution of controversies as between states, and (e) the shared interests of the several states in furthering fundamental substantive social policies." *Lesnick*, 35 F.3d at 946.

The state of West Virginia, the forum state, has substantial interest in this litigation. *See McGee*, 355 U.S. at 223, 78 S.Ct. 199 (finding that the state frequently will have an interest in "providing effective means of redress for its residents"). The plaintiff is a resident of West Virginia and was injured here. The plaintiff purchased the allegedly defective product in West Virginia and witnesses to his injury, if there be any, would likely be located here as well. While there may be some inconvenience to the defendant in having to defend itself in the forum state, the inconvenience does not rise to a denial of due process.

5. If Midwest's position were the law, large manufacturing defendants could in effect insulate themselves from litigation in every state but the one in which they turn over their goods for nationwide distribution. Simply by employing a willing middleman, defendants could purposefully avail themselves of a jurisdiction's benefits and protections, but avoid liability there. The anomalous result would unfairly burden plaintiffs residing and injured in states that rely heavily on national retail chains and whose populations have few resources with which they could pursue litigation in distant jurisdictions.

## VII.

This Court is fully aware of the "individual sovereignties inherent in our system of federalism." *Lesnick*, 35 F.3d at 945. However, in rural states like West Virginia, the Mom and Pop stores that once dominated the retail economy have virtually disappeared— so have the shoe salesmen and the Fuller Brush man. Main street is mostly shuttered, and the retail economy is no longer significantly indigenous. Superstores like Wal-Mart, Kmart, and Lowe's now dominate. Our mail boxes are crammed with mail-order catalogues, wares are hawked on television shopping networks, and corporations using the Internet close countless sales with West Virginians in an instant. Manufacturers of finished products which purposely and intentionally direct them into the state through national retailers that combine the functions of advertiser, wholesaler, distributor, and retailer must expect to be haled into court in West Virginia when one of their products is implicated in the wrongful injury of a party here. This is so because a manufacturer that sells its products through such a national retailer completely manifests its direct purpose and intent to sell its product in this sovereign state. Accordingly, the Court **FINDS** that Midwest has purposefully availed itself of the benefits and protections of doing business in the state of West Virginia and has established minimum contacts with the state such that jurisdiction may be asserted without offending traditional notions of fair play and substantial justice. The defendant's motion is **DENIED**.

The Court **DIRECTS** the clerk to send a copy of this Order to counsel of record and to any unrepresented parties.